A97A1495, A97A1496. ROSE v. FIGGIE INTERNATIONAL, INC.;
and vice versa.
(495 SE2d 77)

BEASLEY, Judge.

This is a product liability action arising from an incident in which a nozzle assembly of a fire extinguisher spontaneously exploded and separated from the canister. It caused a cloud of chemicals to disperse in Margaret Rose's apartment, allegedly harming Rose. She sued the manufacturer of the fire extinguisher, Figgie International, Inc., whose motion in limine was granted so as to exclude evidence of similar spontaneous explosions of the same model extinguisher and to exclude evidence of Figgie's subsequent recall of the extinguisher for a manufacturing defect that caused spontaneous explosions. At Rose's request, the court also excluded evidence of psychiatric and psychological evaluations of Rose, which diagnosed Rose as suffering from psychiatric disorders that caused her to create or exaggerate her physical symptoms. In this interlocutory appeal we hold that the trial court erred in granting both motions in limine.

*Case No. A97A1495*

Since 1980, Figgie has designed, manufactured, marketed, and sold a fire extinguisher known as the American LaFrance Model P-250MA. Figgie admits that in some of the fire extinguishers it manufactured between August and October 1985, the threads on the collar or spud of the extinguishers were slightly out of tolerance, meaning the diameter of the hole into which the valve was screwed was larger than it should have been. This manufacturing defect would sometimes result in the nozzle assembly spontaneously exploding and separating from the canister, the contents of which were under 190 psi of pressure. Figgie's representative testified that unless an extinguisher was improperly cross-threaded when being recharged, or had been struck sideways with sufficient force to damage the valve, the defective threading was the only reasonable explanation for a spontaneous explosion and valve separation.

Figgie's records show that by May 1990 it had received notice of over 50 incidents of spontaneous valve separation explosions involving this model. Later that month Captain Irvine of the DeKalb County Fire Department notified Figgie that four extinguishers of this model had recently exploded in DeKalb County. Figgie made no public announcements or warnings at that time.

During the night of September 4, 1990, as Rose and her children slept in their DeKalb County apartment, the nozzle assembly on their Figgie fire extinguisher model P-250MA spontaneously exploded and separated from the canister. Rose inhaled the chemicals released by the explosion while she evacuated her children from the apartment and made phone calls to get help. She alleges she suffered permanent lung damage as a result. The day following the incident, a maintenance employee of the apartment complex disposed of the exploded extinguisher without the knowledge or consent of Rose or Figgie.[1]

In May 1991, Figgie issued a notice recalling its model P-250MA extinguishers manufactured during the August through October 1985 time period and specified the serial numbers, including the serial number of Rose's extinguisher. The basis for the recall, which references Rose's and the four other explosions in DeKalb County, was the valve threading defect.

Rose sued Figgie, asserting strict liability, negligent manufacture, breach of warranty, and failure to warn. She also sought puni-

---

[1] Figgie's representative initially claimed that the extinguisher was possibly returned to Figgie and discarded. In a subsequent deposition he testified that upon further review it appeared that Figgie had never received the extinguisher. Rose's daughter testified that she saw the maintenance man remove the extinguisher, which testimony Rose confirmed.

tive damages. Figgie moved to exclude evidence of the 50 other incidents of spontaneous explosions and of the recall notice. Ruling to exclude other-incident evidence, the court explained orally that without the extinguisher Rose could not establish that the other extinguishers were substantially similar, for she could not prove that hers had the same manufacturing defect as the others which exploded. At the hearing on the motion to reconsider the ruling, the court reiterated that "without the instrumentality, I don't see how you can bring any substantially similar or any other incident in. There is nothing to compare it to. . . . You don't have the instrumentality to compare to any other incident." Accordingly, the court also excluded evidence regarding the recall notice. Rose appeals from these two rulings.

1. Decisions to exclude evidence of similar incidents are "reviewed for abuse of the trial court's discretion. [Cits.]" *Whitley v. Gwinnett County*, 221 Ga. App. 18, 20 (3) (470 SE2d 724) (1996). But where the record indicates that the court based its decision on a misapprehension of the law, reversal is appropriate. *Phillips v. Drake*, 215 Ga. App. 210, 211 (1) (449 SE2d 879) (1994). See *Flagg v. State*, 187 Ga. App. 297, 299 (2) (370 SE2d 46) (1988) (sentencing reversed where court misapprehended the law). This is also true where the court misapprehends the facts. *Ga. Building Svcs. v. Perry*, 193 Ga. App. 288, 290 (1) (a) (387 SE2d 898) (1989) (exclusion of evidence reversed). We find the trial court based its decision on a misapprehension that the law requires the availability of the instrumentality in question to establish it had the same manufacturing defect.

(a) The court correctly held Rose must first establish that her extinguisher had the manufacturing defect at issue. Without that fact, it would be unnecessary to decide whether the 50 incidents involving other extinguishers with the defect were substantially similar. "In product liability actions, evidence of other incidents involving the product is admissible, and relevant to the issues of notice of a defect and punitive damages, provided there is a showing of substantial similarity. Without a showing of substantial similarity, the evidence is irrelevant as a matter of law." (Citations and punctuation omitted.) *General Motors Corp. v. Moseley*, 213 Ga. App. 875, 877 (1) (447 SE2d 302) (1994). See *Mack Trucks v. Conkle*, 263 Ga. 539, 544 (3) (436 SE2d 635) (1993); *Skil Corp. v. Lugsdin*, 168 Ga. App. 754, 755 (1) (309 SE2d 921) (1983). Regarding punitive damages, "evidence that appellant knew from complaints of similar incidents that the probable consequence of a certain defect would be to inflict injury was relevant to the question of malice or wanton misconduct. [Cits.]" *Skil Corp.*, supra, 168 Ga. App. at 755. Also, "the manufacturer's knowledge of dangerous propensities is relevant to its duty to adequately warn of same. [Cits.]" Id.

The court found the absence of Rose's extinguisher precluded a

showing that it had the same manufacturing defect as the other extinguishers. But "[i]t has often been held that the existence of a manufacturing defect in a products liability case may be inferred from circumstantial evidence." *Firestone Tire &c. Co. v. King*, 145 Ga. App. 840, 842 (1) (244 SE2d 905) (1978). See *Folsom v. Sears, Roebuck & Co.*, 174 Ga. App. 46, 47 (329 SE2d 217) (1985). Because a product may be destroyed as a result of an incident, circumstantial evidence is particularly appropriate in product liability cases to show the manufacturing defect. For example, in *King* the tire blowout had destroyed the area containing the allegedly defective material so it could not be observed physically. The court reasoned that "[t]o rule that this prevented [King] from establishing a prima facie case would be to insulate manufacturers from liability for defective products in any case where the defect causes its own destruction. Such a result would be totally untenable." Id.

Similarly, in *Skil Corp.*, a saw's blade guard did not close, injuring the plaintiff Lugsdin. Through no fault of either litigant, the saw became unavailable for inspection. Citing the evidence that the saw was new and had not been tampered with or altered, and the expert testimony that there was no other reasonable explanation for failure of the blade guard other than a defect in the saw's spring mechanism, we concluded that "[c]ircumstantial evidence may be used to establish the existence of a manufacturing defect at the time the product left the manufacturer, even where the product is consumed or destroyed in the use that resulted in the plaintiff's injury. Based upon the evidence recited above . . ., there was sufficient evidence from which the jury could infer that the saw was defective when sold by the appellant-manufacturer." (Citations omitted.) 168 Ga. App. at 756-757.

Thus, even without the extinguisher, Rose could use circumstantial evidence to prove it had the same threading defect as the extinguishers in the other incidents. See *Central of Ga. R. Co. v. Butts*, 211 Ga. App. 619, 620 (1) (440 SE2d 218) (1994) (train car with allegedly defective window had been sold for scrap; circumstantial evidence admitted to show defect); *Firestone Tire &c. Co. v. Hall*, 152 Ga. App. 560, 562-563 (1) (263 SE2d 449) (1979) (absent the allegedly defective tire, the jury could infer from circumstantial evidence that "there was no other reasonable explanation for the blowout other than a defect in the tire"); *Glynn Plymouth v. Davis*, 120 Ga. App. 475, 481 (1) (170 SE2d 848) (1969) (though car unavailable, "wholly circumstantial" evidence admissible to show defective brake drums), aff'd 226 Ga. 221 (173 SE2d 691) (1970); *Central of Ga. R. Co. v. Keating*, 45 Ga. App. 811, 814 (3) (165 SE 87) (1932) (bridge portion destroyed in accident; other portions of bridge admissible to show wood was in rotten condition), rev'd on other grounds, 177 Ga. 345

(170 SE 493) (1933).

(b) Circumstantial evidence relevant to prove a manufacturing defect may include evidence of the existence of the defect in goods produced at the same plant at around the same time. Citing *Browning v. Paccar, Inc.*, 214 Ga. App. 496, 498 (1) (a) (448 SE2d 260) (1994), *Goss v. Total Chipping*, 220 Ga. App. 643, 645 (1) (a) (469 SE2d 855) (1996), explained that such "cases involve dangerous defects in manufacturing or producing mass-produced items. A defect in one such item in its design or manufacture would necessarily occur in thousands of identical products. In such cases, proving that the defect existed in other products and caused accidents in the past is highly relevant to proving the facts of the case on trial." See *Carsten v. Wilkes Supermarket of Gwinnett County*, 181 Ga. App. 834, 835 (1) (353 SE2d 922) (1987) (evidence of no complaints regarding turkeys processed at same plant at same time may show no negligence); *Atlanta Coca-Cola Bottling Co. v. Burke*, 109 Ga. App. .53, 58-59 (1) (134 SE2d 909) (1964) (evidence of another Coke bottle with foreign substance admissible if shown to come unchanged from same plant); *E. T. Comer Co. v. Joyner*, 32 Ga. App. 661 (124 SE 356) (1924) (evidence of other bad salt from same storehouse admitted to show defect); *Standard Cotton Mills v. Cheatham*, 125 Ga. 649, 652-653 (3) (54 SE 650) (1906) (evidence of other misaligned machines in same plant admitted to show this machine was misaligned); *Central of Ga. R. Co. v. Bernstein*, 113 Ga. 175 (38 SE 394) (1901) (evidence of other negligent blasts from same time period at same site admissible). See generally Annot., "Admissibility, in action against manufacturer, packer, or bottler for personal injury due to defective or injurious condition of article, of evidence that like products were free from, or were subject to, defective or injurious conditions," 127 ALR 1194 (1940) (a "systematic method of manufacture" will likely produce same defect at other times).

Other jurisdictions agree.[2] For example, *Embs v. Pepsi-Cola Bot-*

---

[2] See *C. A. Assoc. v. Dow Chem. Co.*, 918 F2d 1485, 1489 (10th Cir. 1990) ("Both federal and state courts routinely permit introduction of substantially similar acts or occurrences in product liability actions to demonstrate the existence of a defect"); *McGonigal v. Gearhart Indus.*, 851 F2d 774, 778 (5th Cir. 1988) (evidence that another grenade had exploded prematurely relevant to show this grenade was negligently manufactured); *Nevels v. Ford Motor Co.*, 439 F2d 251, 258 (5th Cir. 1971) (admitted evidence of other loose steering mechanisms in 1967 Mustangs manufactured at same plant to show manufacturing defect); *Rhodes v. Michelin Tire Corp.*, 542 FSupp. 60, 62 (E.D. Ky. 1982) ("few things could be more relevant in a products action than the occurrence or the non-occurrence of other accidents or failures under similar circumstances"); *Gen. Motors Corp. v. Van Marter*, 447 S2d 1291, 1293 (Ala. 1984) (evidence of wiring malfunction in similar car admissible); *Dura Corp. v. Harned*, 703 P2d 396, 410-411 (Alaska 1985) (admitted other exploding air tanks); *Bass v. Cincinnati, Inc.*, 536 NE2d 831, 833 (Ill. App. 1989) ("It is common sense that the higher the number of accidents involving a product the more likely it is that the product is" defective);

*tling &c.*, 528 SW2d 703, 706 (Ky. App. 1975), recites: " 'Some circumstantial evidence is very strong, as when you find a trout in the milk.' There are some accidents, as where a beverage bottle explodes in the course of normal handling, as to which there is common experience that they do not ordinarily occur without a defect; and this permits the inference of a defect. This is particularly true when there is evidence in the case of the antecedent explosion of other bottles of the same product." (Citations omitted.)

(c) Figgie nevertheless argues that similar incidents are only admissible in cases alleging a *design* defect, and not in cases alleging a *manufacturing* defect, as here. A design defect necessarily results in all products having the defect, whereas a manufacturing defect will only occur in those products which were improperly manufactured following design. But because a manufacturing defect involves the use of a systematic process, evidence that some goods produced during a certain time through a certain process had a defect is probative to show that other goods produced during that same time through the same process may also have the defect. See *Goss*, supra, 220 Ga. App. at 645; *Browning*, supra, 214 Ga. App. at 498. See also *Davidson Oil Country Supply Co. v. Klockner, Inc.*, 908 F2d 1238, 1245-1246 (5th Cir. 1990) (similar incidents admissible in both design and manufacturing defects cases).

(d) Figgie next argues that *Firestone Tire &c. Co. v. King*, supra, 145 Ga. App. at 843 (3), prohibited the use of other incidents to demonstrate the existence of the manufacturing defect. *King* did not so hold. The manufacturer in *King* argued that the court should have granted a mistrial when a witness referred to other tire failures. The opinion does not reflect why the manufacturer considered such testimony improper. It may have been because no similarity foundation had been laid, or some other reason. Without addressing whether the testimony was wrongful, we simply held that where the trial court instructed the jury to disregard as unresponsive the testimony objected to, the court acted within its discretion in denying a mistrial.

(e) A jury could infer from the circumstantial evidence that Rose's extinguisher had the same threading defect as the extinguishers involved in the other 50 spontaneous explosions. Between 1980 and 1990 Figgie had manufactured approximately 900,000 fire extinguishers. Figgie admitted that during a specific three-month period in 1985 it manufactured 18,000 P-250MA extinguishers, some of

*Brown v. North American Mfg. Co.*, 576 P2d 711, 716 (Mont. 1978) (similar accidents show door defectively designed). But see *Ford Motor Co. v. Phelps*, 389 SE2d 454, 457 (Va. 1990) (evidence of other 1981 Grenadas that stalled admissible only to show notice and not as corroboration of defect).

which contained a threading defect that would cause the nozzle assemblies from these extinguishers to spontaneously explode and separate from their canisters. Such explosions, in addition to explosions caused by improper recharging, in fact occurred over 50 times. Four were in DeKalb County. Figgie eventually recalled all P-250MA extinguishers manufactured during this three-month period, identifying them by serial number. The P-250MA extinguisher which spontaneously exploded in Rose's DeKalb County apartment was identified by its serial number as manufactured by Figgie during the specific three-month period and as a product included in the recall notice. Even without the extinguisher, such circumstantial evidence is sufficient to establish Rose's extinguisher had the threading defect.

(f) Figgie points out, as the cause of the explosion, that in Rose's original complaint she alleged that on the day preceding the incident the apartment maintenance man had improperly recharged her extinguisher. Citing *Strozier v. Simmons U.S.A. Corp.*, 192 Ga. App. 601, 602-603 (385 SE2d 677) (1989), Figgie argues that Rose, having failed to withdraw these allegations, is bound by them as admissions and may not attempt to prove otherwise. Figgie asserts that because an improper recharge immediately prior to the incident would virtually destroy the inference that a manufacturing defect caused the explosion, this disproves the existence of the defect in Rose's extinguisher and differentiates this explosion from the 50 other incidents.

Following substantial discovery Rose in fact had withdrawn the allegations of recharge, as conceded by Figgie's counsel at oral argument. Even though these allegations may be used as evidence against Rose, they are not conclusive, and she is free to refute or explain them. *Strozier*, supra, 192 Ga. App. at 603. In deposition she explained that these allegations resulted from a miscommunication with her counsel and that the extinguisher had not been moved or touched since a maintenance man checked it in 1986.

(g) The circumstantial evidence being sufficient to demonstrate a threading defect in Rose's extinguisher, the next inquiry is whether the other 50 incidents were substantially similar to the incident in question so as to be admissible to prove notice and punitive damages. *Moseley*, supra, 213 Ga. App. at 877. In the 50 incidents, the nozzle assembly spontaneously exploded and separated in a passive environment and were not preceded by a recharging or a striking of the nozzle. These extinguishers had the threading problem and were manufactured at the same plant during the same time as Rose's. Such demonstrates substantial similarity.

2. Rose contends that the evidence of the product recall is similarly relevant. We agree. "The recall letter is admissible as long as there is first introduced some independent proof that the particular product in question suffered from the same defect. The recall letter

alone is insufficient to create a jury issue of the presence of such a defect in the product. But, it is relevant on the question whether the defect was present when the [extinguisher] left the manufacturer." *Harley-Davidson Motor Co. v. Daniel,* 244 Ga. 284, 287 (2) (260 SE2d 20) (1979). See *Browning,* supra, 214 Ga. App. at 497-498 (1) (lack of recall admissible to show no design defect). See also *Hessen v. Jaguar Cars,* 915 F2d 641, 648-649 (11th Cir. 1990) (car destroyed by fire; recall of bad fuel hose in similar cars admitted); *Nevels v. Ford Motor Co.,* 439 F2d 251, 258 (5th Cir. 1971) (recall for defective steering mechanism of same model car admitted). Compare *Uniroyal Goodrich Tire Co. v. Ford,* 218 Ga. App. 248, 258-259 (5) (a) (461 SE2d 877) (1995) (recall not admitted because concerned a different tire), rev'd on other grounds 267 Ga. 226 (476 SE2d 565) (1996).

In sum, the trial court erroneously ruled that without the extinguisher there was no independent evidence that Rose's extinguisher suffered from the same defect. Other circumstantial evidence reflects that Rose's extinguisher had the threading defect. The court also erred in excluding the evidence regarding recall.

### *Case No. A97A1496*

Figgie cross-appealed the ruling of the trial court excluding the testimony of Dr. David M. Davis, a psychiatrist, and Dr. W. James Powell, a psychologist, who would testify Rose has psychiatric disorders that explain the cause and extent of her alleged respiratory ailments. The ruling exceeded the court's discretion and requires reversal.

Soon after the explosion, Dr. Cook, a pulmonologist, began treating Rose for respiratory problems. Despite a medical history of an apneic spell, seasonal hayfever and allergies, a punctured or damaged lung, and shortness of breath, she told Dr. Cook she had never experienced any type of respiratory problems previously. He has since treated her for chronic obstruction bronchitis, or a bronchospastic disorder, which in his first deposition he could not say to a reasonable medical certainty was caused by her inhalation of the airborne material arising from the explosion incident. He testified in a later deposition that based on the lack of any prior respiratory problems, he believed to a reasonable medical certainty the explosion caused her pulmonary disorders.

The court ordered Rose to undergo an exam from a pulmonologist (Dr. Wellman) hired by Figgie. Dr. Wellman detected audible wheezes in her lungs and determined she had an obstructive airways disease. But he also determined that she made an "extremely minimal" effort to cooperate with his instructions and to exhale maximally. He concluded that "she was trying to make me think that she

was actually sicker than she really is." He further opined that her lung problems were not related to the explosion.

Dr. Burton, a county medical examiner, reviewed Rose's medical records and the contents of the fire extinguisher and opined that Rose's ongoing lung problems were not related to the explosion. Rather, he felt her problems were more consistent with a sporadic asthmatic-type bronchitis, commonly associated with seasonal allergies. He also noted various references in her medical records to "functional overlay," which refers to medical problems without an organic cause but having most likely an emotional or mental cause.

Figgie then deposed Dr. Mazzeo, a neurologist who between 1992 and 1994 treated Rose four times for headaches arising from an auto accident. In addition to her headaches, Rose complained she was depressed and anxious, and Dr. Mazzeo prescribed anti-depressant medicine. But his examinations did not reveal any physical neurological abnormalities to explain her headaches. He diagnosed her headaches as arising from a psychiatric disorder known as somatoform, which he defined as a mental condition that causes the patient to experience physical symptoms out of proportion to any physical insult or ailment. He also noted that she craved the physician-patient interaction, and that she relished the sick role. He repeatedly recommended that she receive psychiatric treatment, which she steadfastly refused. Dr. Mazzeo personally observed no respiratory difficulties, and he did not learn that she had any respiratory complaints until the fourth visit. When asked if the somatization disorder would make Rose more likely to continue with pulmonary complaints beyond those a mentally-unimpaired person would experience, he testified this was likely, but that he would require further evaluation to apply it to her respiratory complaints.

Soon thereafter Figgie moved the court, pursuant to OCGA § 9-11-35, to compel Rose to submit to a psychiatric examination to determine whether her mental condition was causing her pulmonary complaints. Figgie submitted the affidavit of psychiatrist Dr. Davis, who deposed that based on his review of the medical records and depositions, Rose suffered from one or more psychiatric disorders related to the claims asserted in this suit. Figgie also pointed to Rose's testimony in her interrogatory responses and deposition that she had experienced mental depression since the time of the explosion, and that she was seeking recovery for mental distress. Finding that the mental condition of Rose was in controversy and that good cause existed, the court ordered her to submit to a mental examination by Dr. Davis over two days.

Based on an extensive psychiatric evaluation and a full battery of psychological tests, as well as his trained medical observations of the lack of any pulmonary distress, Dr. Davis, assisted by psycholo-

gist Dr. Powell, determined that Rose suffered from a psychiatric clinical disorder of malingering or somatoform and from a psychiatric narcissistic personality disorder with anti-social features and histrionic traits. All of these mental disorders are listed in the *Diagnosis and Statistical Manual of Mental Disorders*, Fourth Edition. Excerpts of the book were attached to Dr. Davis' affidavit.

Dr. Davis deposed that because of these disorders (a) Rose was intentionally producing false or grossly exaggerated physical symptoms motivated by financial compensation of the lawsuit, (b) she often exaggerated or manufactured information to overcome feelings of inferiority and to inflate her own self importance, and (c) she frequently took advantage of others to achieve her own ends. He concluded that her physical complaints were psychiatric in nature and not related to the explosion.

Figgie subsequently deposed Rose's neighbor, who testified that immediately following the explosion Rose told her that she intended to feign a respiratory illness.

Arguing that the psychiatric evidence went solely to her credibility, a matter reserved exclusively for the province of the jury, Rose moved in limine to exclude the testimony of Drs. Davis and Powell. Granting this motion, the court referred to the evidence as "an opinion that essentially says little more than she is a malingerer," which "has nothing to do with this case." Figgie appeals this order.

3. (a) "The credibility of a witness is a matter to be determined by the jury. . . ." OCGA § 24-9-80. Georgia does not allow witnesses to opine that a party or victim is lying or telling the truth, for under this statute credibility "is a matter solely within the province of the jury. An expert witness may not testify as to his opinion of the victim's truthfulness." (Citations and punctuation omitted.) *Campbell v. State*, 221 Ga. App. 135, 137 (470 SE2d 524) (1996). See *Gorski v. State*, 201 Ga. App. 122, 123 (2) (410 SE2d 338) (1991) (psychologist's opinion that victim's testimony not credible is inadmissible); *Jennette v. State*, 197 Ga. App. 580, 581-583 (3) (398 SE2d 734) (1990) (expert testimony about "lying child syndrome" is inadmissible).

Drs. Davis and Powell do not opine that Rose is lying or not credible. Rather, they diagnose her as suffering from recognized psychiatric disorders that have caused her to have or complain of physical symptoms out of proportion to any injuries she may have experienced. These disorders may explain the testimony of other physicians that her respiratory ailments are sporadic and lack an organic basis, and, if linked to the explosion, have continued over a much longer period of time than would normally be expected. This relates directly to the issue of causation. Did the emissions of the exploding fire extinguisher cause the injuries of which plaintiff complains?

Such evidence would also relate to damages. Having indicated

that she was suffering from depression as a result of the explosion, Rose made her mental condition relevant. The extent of that depression and of her physical ailments as exacerbated by her psychiatric disorders is relevant in determining the amount of damages. The evidence is admissible pursuant to OCGA § 24-9-67. The court erred in finding the evidence "had nothing to do with this case."

(b) Rose nevertheless argues that the trial court should not have ordered the psychiatric exam in the first place. Not having appealed from that order or enumerated that order as error, Rose has "waived this issue on appeal." *Wilson v. City of Atlanta*, 223 Ga. App. 144, 145, n. 1 (476 SE2d 892) (1996). Furthermore, the trial court did not err in finding that Rose's mental condition was an issue and that there was good cause to order the psychiatric exam. The testimony of one of Rose's own treating physicians (Dr. Mazzeo) that Rose suffered from a mental disorder of somatoform that had caused or exacerbated headaches after an earlier auto collision and that might similarly cause or exacerbate her pulmonary ailments, made Rose's mental condition a relevant issue in the case and constituted substantial grounds for ordering the psychiatric exam. Also, Rose herself testified her mental depression related back to the explosion.

(c) Rose next argues that Dr. Davis' opinion that Rose is malingering is nothing more than an inadmissible opinion that she is lying. This argument fails for several reasons. First, Dr. Davis testified without contradiction that malingering is a recognized psychiatric clinical disorder. We have previously acknowledged evidence that malingering is a mental condition. *Knudsen v. Duffee-Freeman, Inc.*, 95 Ga. App. 872, 876 (2) (99 SE2d 370) (1957).

Second, he diagnosed its presence in her and also diagnosed her with a psychiatric narcissistic personality disorder with anti-social features and histrionic traits. Moreover, he has a background in pulmonary diseases but observed no pulmonary distress in Rose.

OCGA § 24-9-67 provides that the "opinions of experts on any question of science, skill, trade, or like questions shall always be admissible." Even if the testimony goes to the ultimate issue to be decided by the jury, expert opinion "is admissible where the conclusion of the expert is one which jurors would not ordinarily be able to draw for themselves; i.e., the conclusion is beyond the ken of the average layman. [Cits.]" *Smith v. State*, 247 Ga. 612, 619 (277 SE2d 678) (1981). Based on the uncontradicted evidence of record, the extensive diagnoses of the psychiatric disorders at issue and their impact on Rose's medical symptoms are beyond the ken of average laymen. They explain the cause and extent of the alleged injuries.

We have consistently allowed experts to testify as to malingering. "Whether appellant was feigning injury was a relevant query, and expert testimony relative thereto was properly admitted over a

relevancy objection. [Cits.]" *Wildstein v. Gray*, 146 Ga. App. 222, 223 (2) (246 SE2d 130) (1978). Asserting malingering as a defense in a workers' compensation action, the employer in *David Jordan Logging Co. v. Sales*, 203 Ga. App. 410, 411 (2) (416 SE2d 803) (1992), had a doctor testify "he found no physical reason for the claimant's continued complaints, that some of the claimant's complaints were due to a hysterical reaction to the injury and that psychological factors could be a cause of his continued complaints." *David Jordan Logging* held that the ALJ improperly refused to hear evidence concerning a motive for the malingering.

Physician testimony as to whether the victim was malingering was also allowed in *Drake v. Shurbutt*, 129 Ga. App. 754, 755 (1) (201 SE2d 184) (1973); *Sinclair Oil Corp. v. Hendrix*, 119 Ga. App. 770, 771-772 (2) (168 SE2d 862) (1969); *General Gas Corp. v. Whitner*, 110 Ga. App. 878, 879 (4) (140 SE2d 227) (1965); *Roberson v. Lumbermens Mut. Cas. Co.*, 92 Ga. App. 572, 573 (89 SE2d 270) (1955); *Tifton Brick &c. Co. v. Meadow*, 92 Ga. App. 328, 332-333 (5) (88 SE2d 569) (1955); *Daniel v. Ford Motor Co.*, 88 Ga. App. 58, 60 (76 SE2d 66) (1953); and *Ga. R. &c. Co. v. Howell*, 28 Ga. App. 798, 803-804 (7) (113 SE 101) (1922).[3]

Experts may also "express an opinion as to whether medical or other objective evidence in the case is consistent with the victim's story." (Citations and punctuation omitted.) *Knight v. State*, 207 Ga. App. 846, 847 (1) (429 SE2d 326) (1993). This is not considered a direct opinion as to whether the victim is lying. *Hall v. State*, 201 Ga. App. 626, 627 (2) (411 SE2d 777) (1991).

The trial court abused its discretion in ruling that the expert testimony as to Rose's malingering and other psychiatric disorders was irrelevant and inadmissible.

*Judgment reversed in Case Nos. A97A1495 and A97A1496. McMurray, P. J., concurs. Smith, J., concurs in the judgment only.*

DECIDED DECEMBER 5, 1997 —
RECONSIDERATION DENIED DECEMBER 16, 1997 —

*Calabro & Jennette, Michael M. Calabro, Larry F. Jennette, Jr.,* for appellant.

*Smith, Howard & Ajax, Frederick W. Ajax, Jr., Michael D. St.*

---

[3] Psychiatric evidence of malingering is also allowed in criminal cases to determine the defendant's competency or sanity. *McMichen v. State*, 265 Ga. 598, 606 (9) (b) (458 SE2d 833) (1995); *Taylor v. State*, 261 Ga. 287, 289 (1) (404 SE2d 255) (1991); *Brown v. State*, 261 Ga. 66, 69 (2) (a) (401 SE2d 492) (1991).

*Amand, James T. Brieske*, for appellee.

*Dawson & Huddleston, Patrick A. Dawson*, amicus curiae.