294 Ga. 805
FINAL COPY

S13G0582. LLOYD'S SYNDICATE NO. 5820 v. AGCO CORPORATION.

NAHMIAS, Justice.

Appellee AGCO Corporation (AGCO) manufactured and sold a self-propelled, agricultural spray applicator called the RoGator. In 2005, AGCO began offering an Extended Protection Plan (EPP) to its RoGator customers. Appellant Lloyd's Syndicate No. 5820 d/b/a Cassidy Davis (Cassidy Davis) provided the master policy of insurance for the EPP program, which covered AGCO for certain liability to customers who purchased the RoGator EPP. Glynn General Corporation administered the plans. Between 2005 and 2008, AGCO enrolled about 2,050 RoGator machines in the EPP program. Beginning in 2008, a number of customers presented claims under the EPP based on the failure of wheel motors on the RoGator. In September 2008, after it had paid about 25 claims related to this failure, Cassidy Davis invoked the Epidemic Failure Clause of the master insurance policy and refused to pay for any more

claims.[1]

On June 26, 2009, AGCO sued Cassidy Davis and others asserting various claims, including claims against Cassidy Davis for breach of contract and bad faith denial of insurance coverage. The trial court granted partial summary judgment to AGCO and denied partial summary judgment to Cassidy Davis on a breach of contract issue, holding that the EPP covered failures caused by design and engineering defects in the RoGators. The trial court also denied Cassidy Davis's motion for summary judgment on the bad faith claim, rejecting the insurer's argument that it was not obligated to indemnify AGCO until a court entered a judgment establishing AGCO's legal liability to its customers. The Court of Appeals affirmed the trial court on both issues. See Lloyd's Syndicate No. 5820 v. AGCO Corp., 319 Ga. App. 260, 262-263, 265 (734 SE2d 899) (2012).[2]

Cassidy Davis petitioned for a writ of certiorari, which we granted to

---

[1] The Epidemic Failure Clause says, in relevant part: "In the event that the total number of claims from a common cause for a particular component or components, . . . amounts to more than 10% of the earned units, this shall be considered an 'Epidemic Failure,' and will be the sole responsibility of [AGCO]."

[2] The facts and procedural history of this case are discussed in greater detail in the Court of Appeals opinion. See Lloyd's, 319 Ga. App. at 260-262.

consider two issues: (1) whether the Court of Appeals erred in its interpretation of the coverage provision of the EPP; and (2) whether the Court of Appeals erred in its interpretation of the indemnity provision of the master policy of liability insurance.  As explained below, we conclude that the Court of Appeals misinterpreted the relevant language of both contracts, and we therefore reverse its rulings on both issues.[3]

1.    The RoGator EPP provides that AGCO will repair or replace covered parts "if required due to a MECHANICAL BREAKDOWN or FAILURE that is the result of a true defect in material or workmanship."  The EPP defines a covered "mechanical breakdown or failure" as

> the actual breaking or electronic failure of any covered part of the covered MACHINE while in ordinary use arising from faults attributable to manufacturing defects in workmanship or materials in such MACHINE causing sudden stoppage of the functions thereof and necessitating repair before it can resume work.

It has not yet been established whether the RoGator wheel motor failures were

---

[3] AGCO filed a cross-appeal to the Court of Appeals, contending that because Cassidy Davis initially denied claims based only on the Epidemic Failure Clause, the insurer was estopped from asserting different grounds for denial and that the Epidemic Failure Clause was not enforceable as a matter of law because it was not given to AGCO at the time the policy was issued.  The Court of Appeals rejected both arguments.  See Lloyd's, 319 Ga. App. at 265-266.  In its brief to this Court, AGCO again mentions those arguments, but because AGCO did not seek certiorari itself on those issues and they are not within the scope of the issues on which we granted certiorari, we do not consider them.

3

caused by defects in the manufacture of particular machines or rather from the machine's design. To determine whether the cause needs to be identified, both parties moved for partial summary judgment, asking the trial court to decide whether defects in the RoGator's design or engineering are covered by the EPP.[4] The trial court and the Court of Appeals concluded that the EPP does cover design defects, but that conclusion is not supported by the language of the contract.

(a) In advocating coverage of design defects, AGCO argues first that the phrase "manufacturing defects" as used in the EPP covers both manufacturing and design defects. For this argument, AGCO relies solely on United States v. Western Electric Co., 894 F2d 1387 (D.C. Cir. 1990). That reliance is misplaced. Western Electric involved a consent decree in an antitrust case, and the D.C. Circuit looked primarily to antitrust and patent cases and to the antimonopoly purpose and intent of the decree in reaching its decision; the court did not consider cases dealing with defective products. See id. at 1391-

---

[4] The parties and the courts below have sometimes used the phrase "design or engineering defects," but they have not differentiated between a "design defect" and an "engineering defect" and the terms appear to be synonymous, at least as used in this case. We will therefore simply use the term "design defect" to encompass defects in design and engineering.

1392.[5] This case involves a defective product, and in such cases here in Georgia and nationwide, courts have routinely found a significant distinction between "manufacturing defects" and "design defects."

For example, in Rose v. Figgie International, 229 Ga. App. 848 (495 SE2d 77) (1997), our Court of Appeals explained that "[a] design defect necessarily results in all products having the defect, whereas a manufacturing defect will only occur in those products which were improperly manufactured following design." Id. at 853. Similarly, a federal district court applying Georgia law has explained that "[a] manufacturing defect is a defect that is 'measurable against a built-in objective standard or norm of proper manufacture,'" making it "a fairly straightforward concept," while a design defect is a "more diffuse proposition" because it "calls for the finder of fact to employ a loose balancing

---

[5] The issue in Western Electric was whether, in the consent decree that ended the massive AT&T antitrust litigation, the prohibition on the spinoff regional telephone companies engaging in "manufacture [of] . . . telecommunications equipment" applied only to the fabrication of such products or also to their design and development. See 894 F2d at 1388-1389. The court said that dictionary "[d]efinitions of manufacturing typically include activities equivalent to design and development." Id. at 1391. The court noted, however, that the Oxford English Dictionary's definition of "manufacture" – "'[t]o make or fabricate from material; to produce by labour'" – does not include design, but explained that definition away by saying, "[t]he most that this shows . . . is that 'manufacture' is an inherently ambiguous term." Id. The court then looked to the intent of the parties and the statements of the consent decree's objectives, which left "no question that the parties expected [the decree] to prohibit the design and development of telecommunications products" to advance the decree's antimonopoly purpose. Id.

test to determine whether the manufacturer properly designed the product." Jones v. Amazing Products, Inc., 231 FSupp.2d 1228, 1236 (N.D. Ga. 2002) (citation omitted). This view is shared by courts across the country. See, e.g., Jekowsky v. BMW of North Am., LLC, No. C 13-02158 JSW, 2013 WL 6577293, at *4 (N.D. Cal., Dec. 13, 2013) ("'California recognizes two distinct categories of product defects: manufacturing defects and design defects.'" (citation omitted)); Linden v. CNH Am., LLC, 673 F3d 829, 834 (8th Cir. 2012) ("'Courts and the Restatement of Torts distinguish between design defects and manufacturing defects.'" (citation omitted)). See also Restatement (Third) of Torts: Products Liability § 2 (1998) (distinguishing between manufacturing and design defects as two categories of product defects). In light of these many persuasive precedents, we reject AGCO's argument that the phrase "manufacturing defects" ordinarily encompasses defects in product design.[6]

(b)    AGCO next argues that the EPP's reference to "workmanship or materials" in the definition of a covered "mechanical breakdown or failure"

---

[6] AGCO argues that the many product warranty cases cited by Cassidy Davis are inapplicable here because none of those warranties used language identical to the EPP and none of those cases dealt with extended protection plans that were issued on an individual product basis. Those distinctions seem immaterial, however, and in any event, these many similar cases are certainly more persuasive than AGCO's one case interpreting an antitrust consent decree.

is broad enough to include design defects. The cases on the meaning of "workmanship or materials" are more evenly divided.[7] This case does not require us to determine what that phrase would mean standing alone, however, because the phrase as used in the EPP, like any words used in a contract, must be read in context. See <u>Fidelity Nat. Title Ins. Co. v. Keyingham Investments, LLC</u>, 288 Ga. 312, 314 (702 SE2d 851) (2010). In this contract, covered "mechanical breakdown or failures" does not include failures caused by *any* "defects in workmanship or materials," only by "*manufacturing* defects in workmanship or materials," and as discussed in the previous subdivision, manufacturing defects are distinct from design defects. Thus, even if the phrase "workmanship or materials" might be read in isolation to include product

---

[7] See <u>Stearns v. Select Comfort Retail Corp.</u>, 763 FSupp.2d 1128, 1148 (N.D. Cal. 2010) (collecting cases and recognizing the division of authority). Compare, e.g., id. ("The Ninth Circuit has considered the meaning of 'workmanship' in the context of exclusions in insurance contracts and has concluded that 'workmanship' includes defects in design."); and <u>In re Saturn L-Series Timing Chain Products Liability Litigation</u>, No. 8:07cv298, 2008 WL 4866604, at *15 (D. Neb., Nov. 7, 2008) (concluding that "a defect related to materials and workmanship" and a "design defect" are "substantially the same," reasoning that "design is integrated into each step of the manufacturing process and affects both materials and workmanship"), with, e.g., <u>Brothers v. Hewlett-Packard Co.</u>, No. C-06-02254, 2007 WL 485979, at *4 (N.D. Cal., Feb. 12, 2007) ("[T]he Limited Warranty does not guarantee against design defects, it guarantees against defects in materials and workmanship. . . . Unlike defects in materials or workmanship, a design defect is manufactured *in accordance with* the product's intended specifications." (emphasis in original)); and <u>Cali v. Chrysler Group LLC</u>, No. 10 Civ. 7606, 2011 WL 383952, at *1 (S.D.N.Y., Jan. 18, 2011) (holding that a limited warranty that covered only defects in "material, workmanship or factory preparation" did not cover "defects in vehicle design").

design, the EPP expressly limits the covered defects in "workmanship or materials" to manufacturing defects. See Cooper v. Samsung Electronics Am., Inc., 374 Fed. Appx. 250, 253 (3d Cir. 2010) (holding that a warranty covering "manufacturing defects in materials and workmanship" did not cover design defects).

(c) AGCO also argues that the EPP's use of the phrase "arising from" broadens the contract's coverage to include design defects. The Court of Appeals found this argument persuasive. Noting that "[w]here a contract requires that conduct 'arise out of' an act, 'it does not mean proximate cause in the strict legal sense but instead encompasses almost any causal connection or relationship,'" the court concluded that "[t]he phrase 'arising from faults attributable to manufacturing defects in workmanship or materials' is broad enough to include a breakdown or failure related to a manufacturing defect, even where there was a design or engineering defect." Lloyd's, 319 Ga. App. at 263 (citation omitted). We disagree.

We can assume, without deciding, that the use of the phrase "arising from" means that the EPP provides coverage if there is "'nothing more than a slight causal connection,'" Lloyd's, 319 Ga. App. at 263 (citation omitted), between

8

a manufacturing defect and the failure of a RoGator. But there can be no causal connection at all without such a *manufacturing* defect; the use of the phrase "arising from" does not transform a product that was correctly manufactured in accordance with a defective design into a defectively manufactured product. See Jones, 231 FSupp.2d at 1236 (distinguishing between a manufacturing defect, where the defect is revealed by comparing the manufactured product to the product's design, and a design defect, where the court must determine how the product should have been designed).

(d)    Finally, AGCO contends that, because design defects are not listed in the section of the EPP entitled "What is Not Covered," they are not excluded from coverage. There was no reason to exclude such design defects, however, because they plainly are not covered in the first place.

Because the EPP does not cover design defects, Cassidy Davis was entitled to partial summary judgment on that issue, and the trial court and Court of Appeals erred in ruling otherwise.

2.    The second contract at issue in this case is the master policy of insurance between Cassidy Davis and AGCO, in which Cassidy Davis promised "to indemnify [AGCO] for all sums which [AGCO] shall be held legally liable

to pay in respect of [AGCO's] contractual liability" to its customers under the EPP. After paying for approximately 25 EPP claims based on RoGator wheel motor failures, Cassidy Davis notified AGCO in September 2008 that it would pay no more. In April 2009, AGCO sent the insurer a letter demanding payment of $410,000 in unreimbursed wheel motor claims and invoking OCGA § 33-4-6.[8] Cassidy Davis refused to pay, and when AGCO filed this lawsuit seeking damages for breach of contract, it also included a bad faith claim under OCGA § 33-4-6.

Cassidy Davis moved for summary judgment on this claim, arguing, among other things, that AGCO's demand letter was premature because no payment to AGCO was due under the policy at the time the demand was made and "'[i]t has long been the law that in order to serve as a bad faith demand, the demand must be made at a time when immediate payment is due.'" Stedman v. Cotton States Ins., 254 Ga. App. 325, 327 (362 SE2d 256) (2002) (citation

_____

[8] OCGA § 33-4-6 (a) says:

In the event of a loss which is covered by a policy of insurance and the refusal of the insurer to pay the same within 60 days after a demand has been made by the holder of the policy and a finding has been made that such refusal was in bad faith, the insurer shall be liable to pay such holder, in addition to the loss, not more than 50 percent of the liability of the insurer for the loss or $5,000.00, whichever is greater, and all reasonable attorney's fees for the prosecution of the action against the insurer. . . .

10

omitted). The trial court denied this summary judgment motion, and the Court of Appeals affirmed that ruling. It held that AGCO was liable to pay claims under the EPP "when customers filed claims in accordance with the EPP," and that the term "'indemnify' is broad enough to include any liability, not just liability resulting from a judgment." Lloyd's, 319 Ga. App. at 265. The Court of Appeals failed, however, to read the word "indemnify" in its contractual context.

The Court of Appeals correctly noted that "'indemnify' has been defined as 'to reimburse another for a loss suffered because of a third party's or one's own act or default.'" Lloyd's, 319 Ga. App. at 265 (quoting Certain Underwriters at Lloyd's, London v. DTI Logistics, Inc., 300 Ga. App. 715, 718 (686 SE2d 333) (2009)). AGCO alleged that, at the time it sent the demand letter to Cassidy Davis, it had paid $410,000 in RoGator EPP claims that Cassidy Davis had not reimbursed.[9] If the master policy of insurance said only that Cassidy Davis had to "indemnify" AGCO for payments that AGCO made under the EPP, then the Court of Appeals would be correct that the duty to

_____

[9] Cassidy Davis disputes this allegation, asserting that AGCO had not yet paid the full $410,000 to its customers at the time of the demand letter. We need not resolve that factual dispute, but we note that it is clear that until AGCO actually paid an EPP claim, it had not suffered a loss, so Cassidy Davis was not yet obligated to reimburse AGCO for such a claim.

11

indemnify arose at that time. However, that is not how this insurance contract was written.

Instead, the contract requires Cassidy Davis to indemnify AGCO only for sums that AGCO has been "held legally liable" to pay. Cassidy Davis contends that the contract therefore requires a court to have determined that AGCO was actually liable for the EPP claims it paid before being entitled to reimbursement. See Permasteelisa CS Corp. v. Columbia Cas. Co., 377 Fed. Appx. 260, 263, 267 (3d Cir. 2010) (holding that a commercial insurance policy that provided coverage of amounts for which the insured became "legally obligated to pay" required "the presentation of proofs in a court of competent jurisdiction and a finding by the court or jury of [such] liability"); Builders Mut. Ins. Co. v. Dragas Mgmt. Corp., 793 FSupp.2d 785, 794-797 (E.D. Va. 2011) (collecting cases and concluding that "the majority of courts to have considered the question have held that in order for an insured to be 'legally obligated,' there must have been either a final judgment or a settlement as the result of a suit"), vacated on other grounds, 497 Fed. Appx. 313 (4th Cir. 2012). In response, AGCO argues that the phrase "legally liable" does not necessarily require that a legal judgment of liability actually be rendered, only that such liability would

12

be recognized if the issue was brought to a court.  See Steven Plitt et al., <u>Couch on Insurance</u> § 103:14 (3d ed. 2013) ("The term 'legal liability,' as used in a policy of insurance, means a liability such as a court of competent jurisdiction will recognize and enforce between parties litigant.").

Once again, we need not decide what "legally liable" would mean standing alone, because AGCO's argument again ignores the context in which that phrase is used, namely, the word in this contract right before "legally liable."  The policy does not provide indemnification for EPP claims for which AGCO *is* "legally liable," only claims for which AGCO has been "*held* legally liable."  Thus, Cassidy Davis is required to indemnify AGCO only when there has been an actual *holding* of legal liability by a court, not merely the possibility of such a holding or the prediction of such a holding by the insured.

AGCO finally asserts that "the intent of the policy" is to establish a system whereby Glynn General Corporation, the administrator of the EPP program, would pay customer claims from funds provided by Cassidy Davis.  There is evidence that Cassidy Davis followed this arrangement by providing funds to pay for the initial 25 or so RoGator wheel motor claims, although no court judgment requiring payment of those claims had been entered.  AGCO contends

13

that this conduct proves that the parties intended that Cassidy Davis's obligation to indemnify AGCO would be triggered as soon as a customer made a claim in accordance with the EPP. See Scruggs v. Purvis, 218 Ga. 40, 42 (126 SE2d 208) (1962) ("The construction placed upon a contract by the parties thereto, as shown by their acts and conduct, is entitled to much weight and may be conclusive upon them.").

Cassidy Davis's voluntary reimbursement for the initial RoGator EPP claims does not prove, however, that the contract requires those payments before the entry of a judgment establishing AGCO's legal liability under the EPP — just as AGCO's payment of some EPP claims in order to generate customer goodwill does not make AGCO legally liable for all claims presented under the EPP.[10] More fundamentally, the phrase "held legally liable" in the master policy of insurance is not ambiguous, and we therefore need not look beyond the contract's language to understand its intent. See Hartley-Selvey v. Harley, 261

---

[10] An AGCO employee admitted in his deposition that AGCO had made some "goodwill" payments to customers, meaning that it paid some claims for RoGator wheel motor failures that AGCO did not believe it was legally obligated to pay. Likewise, the master insurance policy does not *preclude* Cassidy Davis from reimbursing AGCO for EPP claims until there has been a court holding as to AGCO's liability for the claims, and indeed Cassidy Davis could do so to maintain goodwill or to avoid an obvious litigation result where it believes the claims were in fact covered. Cassidy Davis explains that it takes a number of claims to suspect that a defect occurred in design rather than in manufacturing, which is a plausible explanation for why the insurer cut off the reimbursements after paying around 25 of them.

Ga. 700, 701 (410 SE2d 118) (1991) ("[W]here the terms of a contract are clear and unambiguous, the court must look to those terms alone to determine the intent of the parties.").

Thus, AGCO's claim for indemnification from Cassidy Davis did not — and will not — accrue until AGCO's legal liability for EPP claims has been established by a court holding. Because Cassidy Davis was therefore entitled to summary judgment on the bad faith claim, the trial court and Court of Appeals erred in ruling to the contrary.

3. We close by noting that neither of our rulings ends this case. On remand, AGCO could still prevail by showing that the RoGator wheel motor failures were in fact caused by a manufacturing defect, bringing those claims under the EPP's coverage. And if the court so holds, then Cassidy Davis's duty to indemnify AGCO for all sums paid on such claims for which AGCO had been held legally liable to its customers would be triggered.

<u>Judgment reversed and case remanded. All the Justices concur.</u>

Decided March 17, 2014.

Certiorari to the Court of Appeals of Georgia – 319 Ga. App. 260.

15

McMickle, Kurey & Branch, Scott W. McMickle, Michael P. Johnson, for appellant.

Freeman, Mathis & Gary, T. Bart Gary, Seth F. Kirby, for appellee.