A11A0934. BITHONEY v. FULTON-DeKALB HOSPITAL AUTHORITY et al.
(721 SE2d 577)

DILLARD, Judge.

Dr. William Bithoney, M.D., relocated from New York to Atlanta after accepting employment in an executive capacity at Grady Memorial Hospital. But the night before his anticipated start date,

---

Bithoney was informed that Grady's governing body, the Fulton-DeKalb Hospital Authority (the "Authority"), did not approve of his hiring and would not permit him to commence work. Bithoney subsequently filed suit against the Authority and Pamela Stephenson, the chair of the Authority's board of trustees (the "Board"), for breach of an oral contract for severance, fraud, and negligent misrepresentation. Thereafter, appellees successfully moved for summary judgment on the grounds that the oral contract was barred by the Statute of Frauds and, further, that Bithoney's claims for fraud and misrepresentation failed as a matter of law. Bithoney appeals the grant of summary judgment to the Authority. For the reasons set forth infra, we affirm.

## I. Factual Summary

Viewing the evidence and construing all inferences in the light most favorable to Bithoney,[1] the facts show that in early 2007, he served as the physician-in-chief of St. Vincent Catholic Medical Centers of New York[2] and vice dean of New York Medical College. Because Bithoney was hired for the purpose of navigating St. Vincent through a bankruptcy and major reorganization resulting in the sale and/or closing of six of the seven hospitals, his employment in that capacity was, by its very nature, finite in duration.

Around April 2007, Otis Story, the then-CEO of Grady—who had previously worked with Bithoney in New York—contacted Bithoney to gauge his interest in coming to work for Grady. Story indicated to Bithoney that he had been given the authority to create an executive team,[3] and that he hoped Bithoney would consider running the day-to-day operations of the hospital. Bithoney was familiar with Grady and its commitment to treating poor and underserved ethnic and cultural minorities (a cause about which he was passionate), and he was excited about the employment opportunity.

Bithoney made several trips to Atlanta during the summer of 2007 to visit Grady and explore the possibility of his employment there. During their discussions, Story indicated that it was his practice to have potential job applicants meet the members of the Board, and requested that Bithoney do so "as a courtesy." On June 5, 2007, Bithoney traveled to Atlanta to meet with various Board members, including the Board's vice president. After Bithoney's

---

[1] *Brock Built, LLC v. Blake*, 300 Ga. App. 816, 816-17 (686 SE2d 425) (2009).

[2] St. Vincent Catholic Medical Centers of New York consisted at that time of seven different hospitals.

[3] Bithoney testified in his deposition that Story had gone so far as to show him a copy of Story's offer letter, which purportedly stated in explicit terms that Story would have the authority to hire his own senior team at Grady.

meeting, the vice president left a voicemail on Story's cell phone (which Story later played for Bithoney) expressing enthusiasm about Bithoney's qualifications and opining that he should be hired immediately.

Following his visit, Bithoney sent an e-mail to Story dated June 9, 2007, in which he communicated his "deeply" held belief in Grady's mission and expressed his excitement about the prospect of working for the hospital. Bithoney further acknowledged that, having just navigated St. Vincent's through bankruptcy, he was "nervous about Grady's finances." Bithoney nonetheless stated that he would be willing to consider a "solid" employment offer, which he expressly stated must include "appropriate not[-]for[-]cause severance payments."

During the months of June and July, Bithoney and Story had ongoing telephone discussions regarding Bithoney's salary needs and other desired employment terms, and Bithoney repeatedly stressed that, because working for Grady would require him to uproot his family (his wife was also a working professional), it was critical to him that he have an appropriate severance package in the event he was terminated from Grady without cause. Story indicated that Grady would be willing to provide him an appropriate severance.

Bithoney made at least two additional trips to Atlanta in July 2007 during his generalized employment discussions with Story. One such visit was for the specific purpose of meeting Stephenson, chair of the Board. During that visit, Stephenson told Bithoney, "[W]elcome to the Grady family, we are looking forward to your joining us."

The employment discussions between Bithoney and Story became more focused throughout July and it is undisputed that by August, they had reached a verbal agreement pursuant to which Bithoney was to begin work as Grady's senior vice president of administration on October 15, 2007. It is further undisputed that they agreed on Bithoney's annual salary, an annual incentive bonus, and the amount Bithoney would receive as reimbursement for relocation and temporary housing expenses. Finally, Bithoney contends that he and Story agreed that he would receive "a severance payment of 15 months' salary if Grady terminated [his] employment without cause."

As Bithoney awaited a written draft employment contract, he became "worried" that the "politics at Grady" were causing a delay in the contracting process. Nevertheless, after receiving Story's assurances that "[w]e will get this done," Bithoney accepted an offer on his home in New York and began looking at homes in Atlanta to purchase.

By mid-August, Bithoney received a draft employment contract from Grady. This draft included a provision that, in the event

Bithoney was terminated without cause,[4] he would receive "full severance payments" which would be "payable for 15 months from the effective date of said termination." Bithoney coordinated with Michael Black, Grady's then-vice president of human resources, to construct a final draft of the agreement, which was then approved by Story and submitted to Grady's legal department for approval.[5]

Bithoney informed Story that, based upon Story's "verbal guarantee that we shall move forward on signing the . . . contract," he made an offer on a home in Atlanta. And because the employment contract was not yet executed, Bithoney and Story signed an offer letter to effectuate the home closing, in which Grady "confirm[ed]" Bithoney's acceptance of Grady's offer of employment (the "Offer Letter").[6] The Offer Letter included Bithoney's agreed upon title, start date, salary, annual incentive payment, and reimbursement of moving/relocation expenses. It concluded, "[t]his letter is intended only to confirm your initial employment status as an employee at-will and serves as a framework for the development of a [f]ormal [c]ontract." Upon receipt of the Offer Letter, Bithoney sent an e-mail to Black acknowledging that the offer letter did not contain certain terms, including the not-for-cause severance provision, which Bithoney had been advised needed to be left for the formal contract. Bithoney nonetheless reiterated his intent that the severance provision be included in any such contract.

Despite not having an executed employment agreement, Bithoney moved to Atlanta in early October 2007 in anticipation of his October 15 start date. On October 14, the night before he was to begin work, Story informed Bithoney that his employment had been blocked by the Board, and Bithoney was never permitted to begin work with Grady in the position for which he was hired.

## II. Summary of Trial Court Proceedings

Thereafter, Bithoney filed suit against the Authority and Stephenson, alleging breach of contract, fraud and negligent misrepresentation, and asserting entitlement to punitive damages and attorney fees. Specifically, Bithoney alleged that he and Story entered into an oral contract pursuant to which he was entitled to "a

---

[4] Instead of using the term "without cause," the draft agreement referred to an "involuntary termination" without "the occurrence of a major infraction" as that term was defined in "Exempt Employee severance policy," which was expressly incorporated into the agreement but was not included in the appellate record.

[5] The record contains several drafts of the agreement, all of which contain the pertinent language quoted infra regarding the severance agreement.

[6] The offer was contingent upon Bithoney submitting the necessary pre-employment information and passing a physical examination and drug test.

severance payment equal to 15 months' salary" for not-for-cause termination, the existence of which he asserted was "re-confirmed" in the draft employment agreement which "contain[ed], among other things, the severance terms agreed upon." Bithoney further alleged that Stephenson's statement, "[W]elcome to the Grady family, we are looking forward to your joining us," amounted to fraud and/or negligent misrepresentation insomuch as it communicated that the Board was agreeable to Bithoney's employment and otherwise concealed the existence of the Board's opposition to his hiring.

The Authority served Bithoney with discovery, which included an interrogatory question asking him to explain the basis of his contention that he had entered into a contract with Story. As he had in his complaint, Bithoney maintained in a verified response that he and Story orally agreed that he would receive "a severance payment of 15 months' salary if [Grady] terminated [his] employment without cause," the "terms" of which were "contain[ed]" in the draft employment agreement.

The Authority also conducted a videotaped deposition of Bithoney. Again in his deposition, Bithoney contended that he and Story orally agreed to "a severance payment of 15 months' salary" for termination without cause. The Authority then directed Bithoney to the assertion in both his complaint and interrogatory response in which he alleged that the draft employment agreement "contain[ed]" the "severance terms" agreed upon. The Authority handed Bithoney four draft employment contracts that had been exchanged between he and Black, and asked him to identify which document contained language describing the severance to which he and Story had agreed:

> [Authority]: Look at these four documents and tell me, please, whether you can identify either one of them as containing or as being the document that you referred to as having been sent to you . . . which contain[s] language that you contend describes the severance arrangement that you claim to have reached with Mr. Story.
> [Bithoney]: Well, in going over these as you handed them to me, I immediately looked at the one that . . . handwritten on it is 8/29—
> [Authority]: All right.
> [Bithoney]: —which I assume is 8/29/07. And on page 3 . . . it says, "Employee shall receive full severance payments upon separation["] and . . . ["]shall be payable for 15 months from the effective date of said termination."
> [Authority]: And is it your testimony and contention that the document you have identified . . . contains the language

and terms that you claim describe the oral severance agreement that you claim to have reached with Mr. Story?

[Bithoney]: We did agree on 15 months severance for not, not-for-clause [sic] termination.

[Authority]: And my question to you is whether the document contains the language of that agreement as you contend it existed.

[Bithoney]: Yes.

[Authority]: And is that, to the best of your knowledge, the same document . . . in which you allege in your complaint the existence of a writing which contained, among other things, the severance terms that you claim were agreed upon?

[Bithoney]: This is one of the documents that states the severance. Yes.

[Authority]: [After marking the document for identification] . . . I hand you again the document . . . and just ask that you identify it again for the record as the document that you identified that contains a written description of the severance terms that you claim you and Mr. Story agreed upon.

[Bithoney]: Yes, it does.

Following the deposition, the Authority filed a motion for summary judgment, contending that the oral agreement as Bithoney alleged it existed fell within the Statute of Frauds because it could not be performed within one year of its making and was therefore unenforceable in the absence of a signed writing by the Authority.[7] In response, Bithoney filed an affidavit explaining that he and Story discussed and agreed on the amount of severance to which he would be entitled if terminated without cause (i.e., 15 months of salary), but that at no time did they discuss or negotiate how or when the severance would be paid (i.e., whether it would be paid in a lump sum or paid over time). Bithoney further explained that during his deposition, he understood the Authority's counsel to be asking him whether any of the draft contracts contained the 15-month severance provision that had been part of the oral agreement, but that he did not understand the question to be referring to the other provisions of the paragraph, including the payment schedule. Bithoney added that, had he been asked directly whether the oral agreement specified how the severance would be paid, he would have responded in the negative.

---

[7] *See* OCGA § 13-5-30 (5).

Applying the rule set forth by our Supreme Court in *Prophecy Corp. v. Charles Rossignol, Inc.*,[8] the trial court held that Bithoney affirmatively testified that the language of the draft employment agreement reflected the terms of the agreed upon oral severance agreement (i.e., that it would be paid over a 15-month period), and that the explanation given in his later-filed affidavit contradicting that testimony was not reasonable. The trial court therefore construed the conflicting testimony against Bithoney and concluded that the alleged oral severance agreement included a provision that it be paid over a period of 15 months, and its enforcement was thus barred by the Statute of Frauds. The trial court further held that Stephenson's statements were insufficient as a matter of law to support a claim for either fraud or negligent misrepresentation. This appeal follows the trial court's grant of summary judgment to appellees.

## *III. Analysis*

1. Bithoney argues that the trial court misapplied the *Prophecy* rule in construing his testimony against him and granting appellees summary judgment on his breach-of-contract claim. We disagree.

Under Georgia law, the Statute of Frauds requires, inter alia, that "[a]ny agreement that is not to be performed within one year of the making thereof" be in writing and signed by the party to be charged.[9] To fall within the ambit of this statutory provision, a contract must be incapable of being performed within a year; "the possibility of performance of the contract within one year is sufficient to remove it from the Statute of Frauds."[10] Thus, in the event that Bithoney's oral severance agreement contained a provision that it be paid over the span of 15 months' time, its enforcement is barred by the Statute of Frauds.[11] If the payment terms were otherwise unspecified, the oral agreement would not fall within the statute.[12]

In the case sub judice, the trial court based its finding that the

---

[8] 256 Ga. 27 (343 SE2d 680) (1986).

[9] OCGA § 13-5-30 (5). *But see* Daniel P. O'Gorman, *The Statute of Frauds and Oral Promises of Job Security: The Tenuous Distinction Between Performance and Excusable Nonperformance*, 40 Seton Hall L. Rev. 1023, 1032 (2010) ("It is not known for sure . . . why contracts that were not to be performed within one year were included in the Statute [of Frauds], and the provision's purpose has baffled courts, lawyers, and historians.").

[10] *Parker v. Crider Poultry, Inc.*, 275 Ga. 361, 362 (1) (565 SE2d 797) (2002).

[11] *See, e.g., Edwards v. Cent. Ga. HHS, Inc.*, 253 Ga. App. 304, 305 (558 SE2d 818) (2002) ("An oral contract of employment for a term beyond one year is unenforceable under the statute of frauds." (punctuation and citation omitted)).

[12] *See, e.g., Parker*, 275 Ga. App. at 362 ("An employment contract containing no definite term of employment is terminable at the will of either party . . . [and] does not fall within the Statute of Frauds.").

15-month payment schedule was a term of the severance agreement on Bithoney's deposition testimony. And as a result of the trial court's determination that Bithoney's deposition responses constituted a "clear and unambiguous" admission of the 15-month payment term, the trial court rejected Bithoney's averments that he and Story did not discuss how the severance was to be paid.

Under the rule set forth in *Prophecy*, a trial court faced with a party's self-contradictory sworn testimony must construe the testimony against that party on a motion for summary judgment, unless he or she offers a reasonable explanation for the contradiction.[13] Significantly, whether a reasonable explanation has been offered is a question of law for *the trial court*, and we must uphold a trial judge's determination on the issue unless it is *clearly erroneous*.[14] In other words, this Court must affirm the trial court's ruling if there is any evidence to support it.[15]

And here, we cannot say that the trial court's ruling as to the reasonableness of Bithoney's explanation was clearly erroneous. Although Bithoney is not a lawyer and may have been less sensitive to the significance attached to certain words, the Authority's counsel clearly and unambiguously asked if the draft employment agreement—which provided that the severance "shall be payable for 15 months from the effective date of said termination"—"contain[ed] a written description of the severance terms" that he and Story had agreed upon, and Bithoney answered in the affirmative. This representation mirrored the allegation made by Bithoney in his complaint and repeated in his interrogatory response that the draft employment agreement "contain[ed]," among other things, "the severance terms" agreed upon. Moreover, at no time during or after the deposition did Bithoney seek clarification of the questions or attempt to correct or explain his responses. Thus, because we cannot say that there is no evidence to support the trial court's

---

[13] 256 Ga. at 28 (1) ("The rule in Georgia is that the testimony of a party who offers himself as a witness in his own behalf . . . is to be construed most strongly against him when it is self-contradictory, vague or equivocal." (punctuation omitted)); *see also Rhodes v. ABC Sch. Supply, Inc.*, 223 Ga. App. 134, 135 (1) (476 SE2d 773) (1996) ("[W]here the favorable portion of a party's self-contradictory testimony is the only evidence of his right to recover, the opposing party is entitled to summary judgment unless a reasonable explanation is offered for the contradiction." (punctuation omitted)).

[14] *See Rhodes*, 223 Ga. App. at 136 (1); *White v. Shamrock Bldg. Sys., Inc.*, 294 Ga. App. 340, 349 (669 SE2d 168) (2008); *Bass Custom Landscapes, Inc. v. Cunard*, 258 Ga. App. 617, 621 (575 SE2d 17) (2002).

[15] *See, e.g., Sitton v. Print Direction, Inc.*, 312 Ga. App. 365, 366 (1) (718 SE2d 532) (2011) ("The clearly erroneous test is the same as the any evidence rule." (punctuation omitted)); *Katz v. Crowell*, 302 Ga. 763, 764 (691 SE2d 657) (2010) ("Because the clearly erroneous test is in effect the same standard as the any evidence rule, appellate courts will not disturb fact findings of a trial court if there is any evidence to sustain them." (punctuation omitted)).

ruling, we are constrained to conclude that it did not *clearly err* in applying the rule of *Prophecy* to hold that enforcement of the oral severance agreement was barred by the Statute of Frauds.[16]

2. Bithoney further contends that the trial court erred in granting summary judgment to appellees on his claims for fraud and negligent misrepresentation. Again, we disagree.

In order to establish a claim of fraud under Georgia law, a plaintiff must prove "(1) false representation by a defendant; (2) scienter; (3) intention to induce the plaintiff to act or refrain from acting; (4) justifiable reliance by the plaintiff; and (5) damage to the plaintiff."[17] In turn, to prove negligent misrepresentation, "a plaintiff must show that (1) the defendant negligently supplied false information to foreseeable persons, known or unknown[;] (2) such persons reasonably relied upon that false information[;] and (3) economic injury proximately resulted from such reliance."[18] To survive summary judgment on either claim, "there must be some evidence from which a jury could find each element of the tort."[19] And significantly, "when the representation consists of general commendations or mere expressions of opinion, hope, expectation and the like, the party to whom it is made is not justified in relying upon it,"[20] and thus, it cannot serve as the basis for either a fraud or a negligent misrepresentation claim.

And here, it is undisputed that Bithoney's claims of fraud and negligent misrepresentation are based *solely* upon Stephenson's statement, "[W]elcome to the Grady family, we are looking forward to your joining us." But Bithoney admitted in his deposition that at

---

[16] *See Nghiem v. Allstate Ins. Co.*, 292 Ga. App. 588, 590-91 (664 SE2d 925) (2008) (holding appellant's contradictory testimony as to the frequency of his girlfriend's use of his automobile was insufficient to create a genuine issue of material fact on summary judgment); *Touchton v. Amway Corp.*, 247 Ga. App. 269, 270-71 (543 SE2d 782) (2000) (affirming trial court's rejection of appellant's contradictory testimony as unreasonable and subsequent grant of summary judgment to appellee); *Gill v. B & R Int'l, Inc.*, 234 Ga. App. 528, 532 (2) (507 SE2d 477) (1998) (construing appellant's self-contradictory statements against him and concluding that a severance pay agreement was unenforceable); *Rhodes*, 223 Ga. App. at 135-36 (1) (affirming trial court's grant of summary judgment to appellees and holding that appellant's affidavit in which he claimed to be confused during his deposition did not reasonably explain his contradictory testimony).

[17] *Pyle v. City of Cedartown*, 240 Ga. App. 445, 447 (1) (524 SE2d 7) (1999).

[18] *Boeing Co. v. Blane Int'l Group*, 276 Ga. App. 672, 676 (3) (624 SE2d 227) (2005).

[19] *Crawford v. Williams*, 258 Ga. 806, 806 (375 SE2d 223) (1989); *see Holmes v. Grubman*, 286 Ga. 636, 640-41 (1) (691 SE2d 196) (2010) ("[T]he only real distinction between negligent misrepresentation and fraud is the absence of the element of knowledge of the falsity of the information disclosed." (punctuation omitted)); *Hightower v. Century 21 Farish Realty*, 214 Ga. App. 522, 524 (2) (448 SE2d 271) (1994) ("The same principles apply to both fraud and negligent misrepresentation cases.").

[20] *Anderson v. Atlanta Comm. for the Olympic Games, Inc.*, 261 Ga. App. 895, 900 (2) (584 SE2d 16) (2003); *see also DaimlerChrysler Motors Co., LLC v. Clemente*, 294 Ga. App. 38, 51 (3) (668 SE2d 737) (2008).

the time of Stephenson's statement, he had not yet accepted employment at Grady, nor had he and Story agreed to the material terms of his employment contract—including his position, salary, and benefits.[21] Indeed, Bithoney testified that, although he and *Story* had engaged in generalized conversations as to his salary and other employment terms at that time, those discussions did not become more specific until *after* he had met Stephenson.[22]

It follows, then, that Bithoney could not have reasonably believed Stephenson's statement to be anything more than an expression of optimism and courtesy at the time it was made. We simply cannot agree with Bithoney's assertion that Stephenson's remark can be properly characterized as a confirmation of his employment and/or an indication of Board approval when, by his own admission, the essential terms of his employment had not yet even been discussed.

Moreover, critical to any claim of fraud or negligent misrepresentation is proof that a plaintiff *"actually* and justifiably relied" on the representation forming the basis of his or her claim.[23] Even assuming that Stephenson's statement could be construed in the nature asserted by Bithoney, he cannot establish that he actually relied upon her representation in his decision to accept employment at Grady. By Bithoney's own admission, aside from the "courtesy meeting," he never discussed with Stephenson his anticipated employment or the terms thereof, and at no time did he believe any such discussions to be necessary. Indeed, in Bithoney's mind, Stephenson was an irrelevant factor in his hiring.

Thus, while we are deeply sympathetic to Bithoney's position, we cannot escape the conclusion that his claims for fraud and negligent misrepresentation fail as a matter of law.[24] And because

---

[21] In fact, as of July 26, 2007 (the date Stephenson allegedly made the statement to Bithoney), Story had not even presented the Board with his proposal for the position he had in mind for Bithoney.

[22] A month after the July 26, 2007 meeting between Bithoney and Stephenson, as a result of a series of discussions in which Stephenson played no part, Bithoney and Story negotiated the terms of an at-will employment relationship, the proposed terms of which were memorialized in an August 30, 2007 letter.

[23] *Benefit Support, Inc. v. Hall County*, 281 Ga. App. 825, 835 (8) (637 SE2d 763) (2006) ("[P]laintiffs must show they *actually* and justifiably relied on the representations in [defendant's] reports before they may recover for their losses under a common law negligent misrepresentation theory of recovery." (punctuation omitted)); *see also Condios, Inc. v. Driver*, 145 Ga. App. 537, 538 (1) (244 SE2d 85) (1978) ("One of the essential elements of an action for fraud is justifiable reliance by the plaintiff." (punctuation omitted)).

[24] *See generally DaimlerChrysler Motors Co., LLC*, 294 Ga. App. at 51 (3) (holding claims for fraud and negligent misrepresentation could not be based upon franchisee's display of its "Five Star certification," which constituted a "general commendation[ ] or mere expression[ ] of opinion, hope, expectation and the like"); *Anderson*, 261 Ga. App. at 900 (2) (holding

Bithoney cannot establish the essential elements of the underlying torts he alleges (thereby rendering his claims fatal), he is not entitled to any recovery sounding in compensatory damages, much less punitive damages.[25] Accordingly, we affirm the judgment of the trial court.

*Judgment affirmed. Mikell, C. J., and Smith, P. J., concur.*

DECIDED NOVEMBER 30, 2011 —
RECONSIDERATION DENIED DECEMBER 16, 2011 — 

*Buckley & Klein, Daniel M. Klein*, for appellant.
*Rogers & Hardin, Richard H. Sinkfield, Catherine M. Bennett, Holland & Knight, Charles S. Johnson III, Robert S. Highsmith, Jr., Joshua I. Bosin*, for appellees.

---

appellee's statement that Atlanta would be "the safest place on the planet" during the Olympic Games was merely an expression of "opinion, hope, and expectation" and could not sustain a claim for fraud or negligent misrepresentation). *Cf. Jarema v. Olin Corp.*, 4 F3d 426, 427 (6th Cir. 1993) (Boggs, J.) (characterizing the statement "We feel that you have a great career ahead of you with Olin . . ." as "[a]n expression of optimistic hope for the future").

[25] *See, e.g., Stiefel v. Schick*, 260 Ga. 638, 639 (398 SE2d 194) (1990) (holding that "a party is not entitled to punitive damages if the party fails to set out a cause of action in tort").