A11A1806. HOME DEPOT U. S. A., INC. v. WABASH NATIONAL CORPORATION.

(724 SE2d 53)

BARNES, Presiding Judge.

This case centers on 33 flatbed trailers manufactured by Wabash National Corporation and leased to Home Depot U. S. A., Inc. After using the trailers for several years, Home Depot brought this action against Wabash in which it alleged multiple tort claims predicated on its assertion that the coupling assemblies of the 33 trailers had been defectively manufactured. Home Depot also asserted multiple claims pertaining to a repair procedure developed by Wabash for correcting cracks and corrosion in the coupling assemblies of the trailers. Following discovery, the trial court entered an order granting summary judgment in favor of Wabash on all of Home Depot's claims. For the reasons discussed below, we affirm.

To prevail at summary judgment under OCGA § 9-11-56, the moving party must demonstrate that there is no genuine issue of material fact and that the undisputed facts, viewed in

---

the light most favorable to the nonmoving party, warrant judgment as a matter of law. OCGA § 9-11-56 (c). A defendant may do this by showing the court that the documents, affidavits, depositions and other evidence in the record reveal that there is no evidence sufficient to create a jury issue on at least one essential element of plaintiff's case. If there is no evidence sufficient to create a genuine issue as to any essential element of plaintiff's claim, that claim tumbles like a house of cards. All of the other disputes of fact are rendered immaterial.

(Emphasis omitted.) *Lau's Corp. v. Haskins*, 261 Ga. 491 (405 SE2d 474) (1991).

Viewed in the light most favorable to Home Depot as the nonmovant, the record shows that at all times relevant to this litigation, Wabash designed, manufactured, and marketed standardized and customized truck trailers and related transportation equipment. Over the course of many years, Home Depot relied upon several hundred Wabash-manufactured flatbed trailers to deliver its products to homes and construction sites throughout North America. At Home Depot's direction, the trailers had been purchased from Wabash by Ryder Truck Rental, Inc. or Lease Plan U. S. A., leased to Home Depot, and then operated by third-party carriers under contract with Home Depot.

To meet Home Depot's operational requirements, Wabash specially designed the flatbed trailers to allow a heavy forklift to be mounted on the rear of the trailer. Part of the design pertained to the trailer's kingpin and coupler assembly. The kingpin assembly is the primary mechanism for attaching the load bearing trailer to the motorized truck tractor. If the kingpin assembly fails, the trailer can disconnect from the tractor without having any steerability.

Wabash represented to Home Depot that it would fasten a block or two of solid metal ingot inside the kingpin assembly of the trailers to serve as a counterweight; otherwise, the weight of the mounted forklift on the back of a trailer would make it tilt when it was unhooked from the trailer. The counter-weight would be placed inside the upper coupling beneath the trailer bed. Wabash further represented to Home Depot that the kingpin assembly interiors would be coated with a unique anti-corrosive material and would be designed and manufactured with sufficient holes to drain water and moisture. According to Wabash, these special design features meant that a Wabash flatbed trailer would "never rust in its lifetime" and should have "no problem" remaining operable for "10 to 14 or 15 years," longer than the duration of Home Depot's leases with Ryder and Lease Plan.

The trailers leased to Home Depot were manufactured either at Wabash's Scott County, Tennessee facility (the "S" trailers) or its Lafayette, Indiana facility (the "L" trailers). The "S" trailers and "L" trailers did not have the same design.

On July 13, 2007, one of Home Depot's third-party carriers reported that the kingpin had rusted out of an "L" trailer that had been leased to Home Depot from Ryder. On July 19, 2007, after being informed of the kingpin incident, Wabash issued a technical bulletin to Home Depot that provided a methodology for an inspection of the kingpin assemblies of all "S" and "L" trailers for cracks and corrosion. On July 24, 2007, Wabash released a second technical bulletin to Home Depot advising how to repair the kingpin assembly on trailers that failed the inspection.

According to Home Depot, 183 trailers failed the inspection for cracks and corrosion outlined in Wabash's first technical bulletin. On July 27, 2007, and again on July 31, 2007, Home Depot asked Wabash whether the repair specified in the second technical bulletin had been used before and whether there had been any tests conducted to determine its safety and effectiveness. Before Wabash had provided an answer to these questions, Home Depot began having the trailers repaired by Wabash's service providers in accordance with the second technical bulletin. Home Depot paid for the repairs of the trailers and hired a third-party engineering firm to advise it regarding the inspection and repair protocols developed by Wabash.

On October 1, 2007, Wabash communicated that the "[r]epair as noted in [the second technical bulletin] is designed to meet SAE J133." SAE J133, a standard promulgated by the Society of Automotive Engineers, established testing procedures and minimum performance standards for kingpins and their supporting structures. However, Wabash had not conducted any actual lab testing of the repair outlined in the second technical bulletin and thus was unable to provide any testing data to Home Depot to verify its safety and effectiveness.

Without receiving any test data from Wabash, the engineering firm hired by Home Depot was unwilling to provide any assurances about the safety and effectiveness of the repair outlined in the second technical bulletin. However, there is no evidence in the record that either the engineering firm or Home Depot itself ever tested Wabash's repair protocol outlined in the first technical bulletin to determine whether it complied with SAE J133. Nor did Home Depot present, during the course of this litigation, any analysis of the repair's safety and effectiveness from the engineering firm it hired or from any other expert.

In or around August 2008, Home Depot directed its carriers to stop having the Wabash-manufactured trailers repaired in the man-

ner outlined in the second technical bulletin. Home Depot further ordered its carriers to stop using any of the trailers that had received the repair.

Ryder agreed to take back the 150 Wabash-manufactured trailers that Ryder had purchased and leased to Home Depot which had failed the inspection outlined in the first technical bulletin. Home Depot thus was able to mitigate its damages with respect to these trailers, and it transferred and assigned to Ryder "any and all claims[,] demands and cause or causes of action of any kind whatsoever arising out of or relating to" those specific trailers that Home Depot might have against Wabash. Ryder commenced but ultimately dismissed with prejudice an action against Wabash asserting claims relating to the 150 trailers in federal court.

Thirty-three of the Wabash-manufactured trailers that failed the inspection outlined in the first technical bulletin had been purchased by Lease Plan and leased to Home Depot. All 33 were "S" trailers. All were purchased from Wabash by Lease Plan at different times from February 1999 to March 2002. Some of the 33 trailers were repaired using the repair protocol outlined in Wabash's second technical bulletin, and Home Depot incurred costs in carrying out those repairs. Home Depot also incurred lease repurchase costs and salvage costs associated with the 33 trailers.

In September 2008, Home Depot commenced the instant action against Wabash. Home Depot alleged that the corrosion problem identified in the trailers' kingpin assemblies as a result of the inspection outlined in the first technical bulletin had been caused by Wabash's failure to exercise ordinary care in manufacturing the trailers. Specifically, Home Depot contended that instead of fastening one or two blocks of solid metal ingot counter-weighting material inside the kingpin assemblies, Wabash placed loose scrap metal such that drainage holes were blocked. Home Depot further alleged that Wabash had not fully covered the interiors of the kingpin assemblies with the unique anti-corrosive coating that it had represented would be used. Additionally, Home Depot alleged that Wabash failed to exercise ordinary care in designing the repair protocol that was intended to resolve the corrosion problem. Home Depot also asserted claims for fraud, negligent misrepresentation, fraudulent concealment, promissory estoppel, and negligent failure to warn. Lastly, Home Depot sought attorney fees, the expenses of litigation, and punitive damages.

Wabash answered and denied all of the material allegations of the complaint. Following discovery, Wabash moved for summary judgment on all of Home Depot's claims. Home Depot filed a cross-motion for summary judgment on the issue of liability. After hearing oral argument and receiving multiple submissions from the

parties, the trial court entered a 27-page order granting Wabash's motion for summary judgment. The trial court did not rule on Home Depot's cross-motion.

In its summary judgment order, the trial court first concluded that Home Depot had put at issue in this case only the 33 Wabash-manufactured "S" trailers leased from Lease Plan. The trial court went on to rule that Home Depot's claims with respect to the original design and manufacture of those 33 trailers were barred by the terms of the applicable supply contracts between Wabash and Lease Plan. In this regard, the trial court ruled that the terms and conditions of the supply contracts were uncontroverted and that Home Depot was subject to them because it was a finance lessee under Article 2A of Georgia's Uniform Commercial Code ("UCC"). See OCGA § 11-2A-209 (1). According to the trial court, the merger clause, express warranty clause, warranty disclaimer clause, and exclusive liability clause of the supply contracts precluded Home Depot's claims for negligent misrepresentation, fraud, fraudulent concealment, negligent failure to warn, and negligent manufacture to the extent they were all based on the original design and manufacture of the trailers.

The trial court ruled in the alternative that all of Home Depot's tort claims, except for its claims for fraud and negligent misrepresentation, were barred under the economic loss rule. In this respect, the trial court held that the uncontroverted evidence showed that the damages sought by Home Depot were for the loss of the value or use of the trailers and for the cost of repairs, and thus constituted claims for mere economic loss.

In addition, the trial court ruled that summary judgment was appropriate on the alternative ground that Home Depot had failed to come forward with sufficient evidence establishing the elements of any of its claims because there was no evidence that these specific trailers suffered from a manufacturing defect, that Wabash had made any false representations or promises to Home Depot, or that the repair outlined by Wabash in its second technical bulletin was unsafe or ineffective. Lastly, the trial court ruled that because Home Depot could not succeed on its underlying substantive claims, its claims for attorney fees, the expenses of litigation, and punitive damages likewise failed as a matter of law.

1. Home Depot now appeals from the trial court's grant of summary judgment in favor of Wabash. As an initial matter, Home Depot asserts that the trial court erred in concluding that the only trailers at issue in this case were the 33 Wabash-manufactured "S" trailers leased from Lease Plan. In its summary judgment briefing in the trial court, Wabash relied upon the settlement agreement between Home Depot and Ryder in arguing that the additional 150

trailers leased from Ryder were not at issue in this litigation. Subsequently, in agreeing with Wabash that the additional 150 trailers were not at issue, the trial court relied in part on the settlement agreement, pointing out that any claims relating to those trailers had been assigned and transferred from Home Depot to Ryder pursuant to that agreement.

On appeal, Home Depot does not contest or present any legal argument challenging the trial court's implicit conclusion that Wabash could enforce the settlement agreement against Home Depot in this action. Any claim in that respect has been waived or abandoned on appeal. See Court of Appeals Rule 25 (a) (3) and (c) (2). Instead, Home Depot simply maintains that it did not assign any of its current claims to Ryder in the settlement agreement.

However, as previously indicated, Section 5A of the settlement agreement expressly "assigns and transfers" to Ryder "any and all claims[,] demands and cause or causes of action of any kind whatsoever arising out of or relating to" the 150 trailers that Home Depot might have against Wabash. Ignoring this contractual language, Home Depot quotes from a separate paragraph of the settlement agreement stating that "nothing in this [a]greement shall be considered as a waiver or release preventing or prohibiting claims against Wabash for any actions or claims either party may have against Wabash," but omits with ellipses the central qualifying language immediately preceding the quoted language, "*except for those claims transferred by Home Depot to Ryder pursuant to Section 5A hereof.*" (Emphasis supplied.) Accordingly, given the language of the settlement agreement clearly assigning and transferring to Ryder all claims pertaining to the 150 trailers, the trial court did not err in concluding that only the other 33 "S" trailers leased from Lease Plan were at issue in this action.[1]

2. We turn now to the trial court's ruling on Home Depot's substantive claims pertaining to the 33 trailers. Among other grounds, the trial court granted summary judgment in favor of Wabash on Home Depot's tort claims (apart from its fraud and misrepresentation claims) on the basis that they were barred under the economic loss rule. The trial court's ruling was proper.[2]

---

[1] We note that Home Depot's Rule 30 (b) (6) representative testified that only the 33 "S" trailers leased from Lease Plan were at issue in this case. But the representative's testimony is best construed as an admission regarding a mixed question of law and fact, and Georgia law provides that a party is not bound to that type of admission. See *Avery Enterprises v. Lyndhurst Builders*, 304 Ga. App. 353, 355 (696 SE2d 389) (2010).

[2] Home Depot contends that the trial court erred in ruling as a matter of law that it was a finance lessee and that its claims with respect to the original design and manufacture of the 33 trailers were barred by the terms and conditions of the supply contracts between Wabash and Lease Plan. We need not resolve whether the trial court erred in this regard, given our

In cases where the losses resulting from a defective product are purely economic in nature, the economic loss rule bars the plaintiff from seeking recovery under strict liability or negligence theories. See *Busbee v. Chrysler Corp.*, 240 Ga. App. 664, 666 (1) (524 SE2d 539) (1999); *Holloman v. D. R. Horton, Inc.*, 241 Ga. App. 141, 147 (4) (524 SE2d 790) (1999). "Economic loss" means damages for the loss of the value or use of the defective product itself, costs of repair or replacement of the defective product, or the consequent loss of profits, unaccompanied by any claim of personal injury or damage to other property. See *Vulcan Materials Co. v. Driltech*, 251 Ga. 383, 384 (1) (306 SE2d 253) (1983); *Henderson v. Gen. Motors Corp.*, 152 Ga. App. 63, 64 (2) (262 SE2d 238) (1979). Courts "have relegated those who suffer such [economic] loss to the remedies of contract law." (Citation and punctuation omitted.) *Vulcan Materials Co.*, 251 Ga. at 387 (3).

In the present case, there is no evidence that anyone suffered physical injury or that any property was damaged other than the trailers themselves as a result of Wabash's alleged negligence; hence, the economic loss rule barred Home Depot's tort claims unless some exception to the rule applied.[3] Home Depot does not dispute this point on appeal.

Georgia has recognized two exceptions to the economic loss rule: the misrepresentation exception and the accident exception. *Holloman*, 241 Ga. App. at 147-148 (4). It is undisputed that the fraud and negligent misrepresentation claims asserted by Home Depot fell within the misrepresentation exception. The issue, therefore, is whether Home Depot's remaining tort claims fell within the accident exception. The trial court properly concluded that they did not.

"Accident in this context means a sudden and calamitous event which, although it may only cause damage to the defective product itself, poses an unreasonable risk of injury to other persons or property." (Citation and punctuation omitted.) *Busbee*, 240 Ga. App. at 667 (2). In *Busbee*, this court refused to apply the accident exception, where the engine in the plaintiff's truck suddenly seized while the plaintiff was driving to work, stranding him in rush hour traffic but not causing "a calamity, sudden violence, collision with another object, or some catastrophic event." Id. We further noted that "inconvenience, aggravation, or fright" did not rise to the level of an "accident" within the meaning of the exception. Id.

---

conclusion that the trial court's grant of summary judgment was appropriate on alternative grounds. See *Gilbert v. City of Jackson*, 287 Ga. App. 326, 327 (1) (651 SE2d 461) (2007) ("A grant of summary judgment must be affirmed if right for any reason[.]").

[3] Of course, Home Depot's claim for promissory estoppel was not a tort claim and thus was not barred by the economic loss rule.

The record reflects that Home Depot first learned of the alleged excessive corrosion problem when a trailer operator employed by its third-party carriers heard a loud noise, pulled over into a parking lot, and discovered that the kingpin on the trailer had rusted out and fallen to the ground. There was no evidence of "a calamity, sudden violence, collision with another object, or some catastrophic event" resulting from the incident; at most, the trailer operator experienced "inconvenience, aggravation, or fright" from having to pull over into a parking lot and discontinue his route due to the rusted-out kingpin. Such an incident cannot be distinguished in any material sense from the incident in *Busbee*. Therefore, the trial court committed no error in concluding that the accident exception did not apply and that the economic loss rule barred Home Depot's tort claims (apart from its claims for fraud and negligent misrepresentation) as a matter of law.

3. The trial court granted summary judgment to Wabash on Home Depot's claims for fraud and negligent misrepresentation pertaining to the original manufacture of the 33 "S" trailers leased from Lease Plan on the ground that Home Depot presented insufficient evidence to establish the essential elements of those claims. Specifically, the trial court concluded that Home Depot presented insufficient evidence that the 33 trailers were manufactured in a manner different from what Home Depot claims was represented by Wabash; therefore, the court ruled that Home Depot could not establish that Wabash had made any false representations regarding the way in which the 33 trailers were originally manufactured. We agree with the trial court.

"The tort of fraud has five elements: (1) a false representation or omission of a material fact; (2) scienter; (3) intention to induce the party claiming fraud to act or refrain from acting; (4) justifiable reliance; and (5) damages." (Citation omitted.) *ReMax North Atlanta v. Clark*, 244 Ga. App. 890, 893 (537 SE2d 138) (2000).

> The essential elements of a claim of negligent misrepresentation are . . . : (1) the defendant's negligent supply of false information to foreseeable persons, known or unknown; (2) such persons' reasonable reliance upon that false information; and (3) economic injury proximately resulting from such reliance.

(Punctuation and footnote omitted.) *Futch v. Lowndes County*, 297 Ga. App. 308, 312 (4) (676 SE2d 892) (2009).

To support its claims for fraud and negligent misrepresentation, Home Depot presented evidence that Wabash represented that it would fasten one or two blocks of solid metal ingot counterweighting material inside the kingpin assembly of the trailers. Home

Depot also presented evidence that Wabash represented that the kingpin assembly interiors would be fully coated with a unique anti-corrosive material and would be designed and manufactured with sufficient holes to drain water and moisture.[4] In its amended complaint and brief opposing Wabash's motion for summary judgment, Home Depot alleged that Wabash's representations were false because loose scrap metal rather than solid metal ingot was used for counter-weighting inside the kingpin assemblies, and because not all of the counter-weighting material in the trailers was covered in an anti-corrosive coating. Home Depot alleged that as a result of these two manufacturing defects, the drainage holes became blocked and the kingpin assemblies retained moisture, causing cracks and excessive corrosion in the kingpins of the trailers.

Notably, Home Depot did not present any eyewitness testimony, expert or otherwise, to establish that the thirty-three trailers at issue suffered from the two alleged manufacturing defects forming the basis for its fraud and negligent misrepresentation claims, i.e., the use of loose scrap metal for counter-weighting and the absence of an anti-corrosive coating.[5] Instead, Home Depot relied on alleged business records from its third-party carriers reflecting that the 33 trailers failed the inspection protocol outlined in Wabash's first technical bulletin.[6] As previously noted, the first technical bulletin established a protocol for inspecting the kingpins and upper coupler assemblies of the trailers for cracks and corrosion. But the fact that the 33 trailers failed an inspection for cracks and corrosion in the kingpin assemblies after many years of use was insufficient to prove that the trailers had loose scrap metal for counter-weighting and the lack of an anti-corrosive coating at the time of their manufacture.

---

[4] Home Depot also alleged that Wabash represented that a Wabash-manufactured trailer would "never rust in its lifetime" and should have "no problem" remaining operable for "10 to 14 or 15 years." But "[i]t is axiomatic that a false representation made by a defendant, to be actionable, must relate to an existing fact or a past event." *Fuller v. Perry*, 223 Ga. App. 129, 131 (1) (476 SE2d 793) (1996). Wabash's representations were on their face mere opinions, expectations, and predictions of the future and thus could not serve as the basis for either a fraud or a negligent misrepresentation claim. See *Bithoney v. Fulton-DeKalb Hosp. Auth.*, 313 Ga. App. 335, 343 (2) (721 SE2d 577) (2011).

[5] Home Depot's Rule 30 (b) (6) representative submitted an affidavit in which he stated in summary fashion that the kingpin assemblies of the trailers had loose scrap metal for counter-weighting material rather than solid metal ingot and had not been properly treated with an anti-corrosive coating. But conclusory and self-serving affidavits are insufficient to create a genuine issue of material fact for trial. See *J. Kinson Cook of Ga. v. Heery/Mitchell*, 284 Ga. App. 552, 559 (d) (644 SE2d 440) (2007).

[6] The parties dispute whether the documents at issue were admissible as business records. We need not resolve this issue because even if the documents were admissible, they failed to create a genuine issue of material fact over whether the thirty-three trailers suffered from the two manufacturing defects forming the basis for Wabash's fraud and negligent misrepresentation claims.

See generally *Miller v. Ford Motor Co.*, 287 Ga. App. 642, 644 (1) (653 SE2d 82) (2007) (noting that the failure of automobile equipment after several years of use "can be the result of myriad causes not related to its manufacture") (citation and punctuation omitted).[7]

Home Depot also relied upon testimony relating to what it characterized as a sample of "exemplar" trailers in an effort to show through circumstantial evidence that the kingpin assemblies of the 33 trailers had loose scrap metal for counter-weighting and lacked an anti-corrosive coating at the time of manufacture. See generally *Firestone Tire & Rubber Co. v. Hall*, 152 Ga. App. 560, 565 (5) (263 SE2d 449) (1979) (existence of manufacturing defect may be inferred from circumstantial evidence). Specifically, Home Depot pointed to the deposition testimony of the Lease Plan sales manager who handled the company's account with Home Depot. The manager testified that sometime after the initial July 2007 kingpin incident involving the "L" trailer leased from Ryder, he saw two Wabash-manufactured trailers at a Home Depot facility that had been taken apart to reveal that loose scrap metal had been used as counter-weighting material rather than solid metal ingot. According to the Lease Plan sales manager, he could see that the loose scrap metal had blocked the drainage holes of the two trailers' kingpin assemblies and had caused water to pool there, leading to corrosion around the kingpin.

Significantly, however, the Lease Plan sales manager conceded that he did not know whether the two Wabash-manufactured trailers that he saw were among the thirty-three at issue here. Moreover, the sales manager admitted that he did not know whether the two trailers he had seen were "S" trailers or "L" trailers, and thus was unable to say whether the two trailers that he observed were manufactured at the same facility and had the same design as the thirty-three trailers. Therefore, while Home Depot characterized the trailers observed by the Lease Plan sales representative as "exemplars," there was no testimony establishing them as such.

While "circumstantial evidence relevant to prove a manufacturing defect may include evidence of the existence of the defect in goods produced *at the same plant at around the same time*," *Rose v. Figgie Intl.*, 229 Ga. App. 848, 852 (1) (b) (495 SE2d 77) (1997) (physical precedent only) (emphasis supplied),[8] that was not the nature of the

---

[7] Home Depot further relied on an internal company inspection conducted by Wabash in 2007 that showed cracks and corrosion in kingpin assemblies of trailers that had been used by Home Depot. Again, the fact that the trailers failed an inspection for cracks and corrosion after many years of use did not establish that the trailers suffered from the two original manufacturing defects alleged by Home Depot.

[8] See, e.g., *Standard Cotton Mills v. Cheatham*, 125 Ga. 649, 652-653 (3) (54 SE 650)

sales manager's testimony. Accordingly, Home Depot could not prove circumstantially the alleged manufacturing defects in the kingpin assemblies of the 33 trailers through the testimony of the Lease Plan sales manager. See *Atlanta Coca-Cola Bottling Co. v. Burke*, 109 Ga. App. 53, 58-59 (1) (134 SE2d 909) (1964) (testimony regarding other bottle of soda had no probative value and was inadmissible, where there was no evidence reflecting that it had been bottled at the defendant's plant where the soda at issue had been bottled).

Home Depot also relied upon the deposition testimony of Wabash's Rule 30 (b) (6) representative in an effort to show circumstantially that the kingpin assemblies of the 33 trailers had loose scrap metal for counter-weighting and lacked an anti-corrosive coating at the time of manufacture. During his deposition, the Wabash representative conceded that at some point in time there had been "S" trailers manufactured using loose scrap metal rather than solid ingot counter-weighting material, and that the metal had blocked drainage holes in the kingpin assemblies and had scratched off the anti-corrosive coating. According to the representative, the loose scrap metal could lead to excessive corrosion in kingpin assemblies by causing water to pool around the drainage holes.

But Wabash's representative testified that he did not know the time period during which loose scrap metal had been used in "S" trailers other than that it was for only a brief period early in the production process, after which it was corrected. Home Depot presented no evidence that the 33 trailers, which were purchased by Lease Plan at varying times from 1999 until 2002, fell within the group of trailers early in the production process to which Wabash's representative was referring. Thus, Home Depot could not establish that the defectively manufactured "S" trailers referred to by Wabash's representative were manufactured "around the same time" as the 33 "S" trailers at issue in the present case; a jury would be left simply to speculate on the issue. The testimony of Wabash's representative was too slim a reed to establish circumstantially that the kingpin assemblies of the thirty-three trailers were defectively manufactured in the manner alleged by Home Depot. See *Rose*, 229 Ga. App. at 852 (1) (b). See also *J. Kinson Cook of Ga. v. Heery/ Mitchell*, 284 Ga. App. 552, 559 (d) (644 SE2d 440) (2007) ("An

---

(1906) (evidence of other misaligned machines positioned on same floor at the same plant admitted to show machine at issue was misaligned); *Carsten v. Wilkes Supermarket of Gwinnett County*, 181 Ga. App. 834, 834-835 (1) (353 SE2d 922) (1987) (evidence of no complaints regarding 125 other turkeys supplied by same wholesaler and purchased from the same supermarket during the same Thanksgiving season was circumstantial evidence that turkey at issue was not infected with salmonella); *Comer Co. v. Joyner*, 32 Ga. App. 661 (124 SE 356) (1924) (evidence that other bad salt was stored in the same place, under the same conditions, and within a few weeks of the salt at issue was properly admitted to show defect).

inference cannot be based upon evidence which is too uncertain or speculative or which raises merely a conjecture or possibility.") (citation and punctuation omitted).

Lastly, in opposing summary judgment, Home Depot relied upon evidence that Wabash-manufactured trailers sold to other customers were found to have cracks and corrosion in their kingpin assemblies at some point during the course of their use, leading Wabash to issue technical bulletins to one customer in 2005 that outlined the same inspection and repair protocols authorized by Wabash in the instant case. But there is no evidence that any of these trailers sold to other customers had kingpin assemblies that were defectively manufactured through the use of loose scrap metal for counter-weighting and lack of an anti-corrosive coating. Nor is there any evidence that the trailers were manufactured "around the same time" as the 33 trailers at issue here. Accordingly, the incidents of cracks and corrosion in the kingpin assemblies of Wabash-manufactured trailers sold to other customers were insufficient to show circumstantially that the 33 trailers had loose scrap metal for counter-weighting and lacked an anti-corrosive coating at the time of manufacture.

For these combined reasons, we agree with the trial court that Home Depot failed to point to specific evidence, direct or circumstantial, giving rise to a triable issue over whether the kingpin assemblies of the 33 trailers at issue suffered from the two alleged manufacturing defects forming the basis for its fraud and negligent misrepresentation claims. Specifically, Home Depot presented no competent evidence establishing that, contrary to Wabash's initial representations concerning how the 33 trailers would be designed and manufactured, Wabash used loose scrap metal for counter-weighting in the kingpin assemblies of those trailers and failed to coat them fully with anti-corrosive material. It follows that Home Depot could not prove that the 33 trailers were manufactured in a manner different from what Home Depot claims was represented; thus, the trial court did not err in granting summary judgment to Wabash on the fraud and negligent misrepresentation claims.

4. The trial court also granted summary judgment to Wabash on Home Depot's claim for fraudulent concealment because of insufficient evidence. To prove fraudulent concealment in cases involving alleged manufacturing defects in a product, the plaintiff must prove that the product was defective at the time of sale and that the defendant manufacturer had actual knowledge of the defect, yet chose to conceal it. *Dasher v. Davis*, 274 Ga. App. 788, 789 (618 SE2d 728) (2005). For the reasons discussed supra in Division 3, Home Depot cannot prove that the 33 trailers at issue suffered from the two manufacturing defects forming the basis for its fraud-related claims. Consequently, because there was no evidence that the 33 trailers

were defective at the time of sale, the trial court committed no error in granting summary judgment in favor of Wabash on Home Depot's claim for fraudulent concealment.

5. Concluding that there was insufficient evidence to create a jury issue, the trial court also granted summary judgment in favor of Wabash on Home Depot's fraud and negligent misrepresentation claims regarding the repair protocol outlined by Wabash in its second technical bulletin. Among other reasons, the trial court concluded that there was no evidence that the alleged misrepresentations regarding the repair proximately caused any harm to Home Depot. Again, we agree with the trial court.

In opposing summary judgment, Home Depot presented evidence of the following sequence of events: (1) on July 27, 2007, Home Depot asked Wabash whether the repair protocol for the kingpin assemblies outlined in the second technical bulletin had been used before and whether it had been tested to determine its safety and effectiveness; (2) on July 31, 2007, Home Depot reiterated to Wabash that it wanted to know whether the repair protocol had been tested; (3) on October 1, 2007, Wabash communicated that the "[r]epair as noted in [the second technical bulletin] is designed to meet SAE J133." According to Home Depot, Wabash's October 1, 2007 statement was false because the repair protocol had not been tested at that point to determine if it met the minimum performance standards for kingpins and their supporting structures set out in SAE J133.

Yet, while Home Depot presented evidence that Wabash had not previously tested the repair protocol as of October 2007 to determine whether it complied with SAE J133, Home Depot presented no evidence that the protocol would have in fact failed that specific test. Notably, Home Depot presented no evidence, through expert testimony or otherwise, regarding the safety or effectiveness of the repair protocol, its compliance with the minimum performance standards for kingpins and their supporting structures set out in SAE J133, or any damage to the trailers caused by the repair. Therefore, even if Wabash's October 1, 2007 communication could be construed as falsely representing that the repair protocol had been tested to determine its compliance with SAE J133, Wabash failed to point to any specific evidence creating a triable issue of fact over whether the representation was the proximate cause of any harm to Home Depot. The trial court thus did not err in granting summary judgment to Wabash on Home Depot's claims for fraud and negligent misrepresentation pertaining to the repair of the trailers.[9]

---

[9] Home Depot points out that after this litigation commenced, Wabash for the first time

6. In addition, the trial court granted summary judgment in favor of Wabash on Home Depot's promissory estoppel claim relating to the repair protocol. The trial court concluded that Home Depot had failed to identify an enforceable promise that it relied upon to its detriment such that its promissory estoppel claim failed as a matter of law. The trial court did not err in this regard.

Under the equitable doctrine of promissory estoppel, "[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." OCGA § 13-3-44 (a). In its amended complaint, Home Depot alleged that by providing the repair protocol for the trailers outlined in the second technical bulletin, Wabash "promised that the trailers could be repaired in a manner that they would be safe to operate on the road."[10]

Even assuming that the alleged promise that the repair would make the trailers "safe to operate on the road" was sufficiently specific and definite to support a promissory estoppel claim,[11] we conclude that the claim nevertheless fails as a matter of law. As explained supra in Division 5, Home Depot failed to present any evidence regarding the safety and effectiveness of the repair protocol, and thus could not establish that the repaired trailers were not "safe to operate on the road." Hence, Home Depot could not show that it relied upon the alleged promise to its detriment, and so the trial court committed no error in granting summary judgment to Wabash on the promissory estoppel claim on this ground.

7. Lastly, the trial court granted summary judgment in favor of Wabash on Home Depot's claims for attorney fees, the expenses of

---

tested the repair protocol outlined in the second technical bulletin but objected to producing the test results. According to Home Depot, Wabash's refusal to produce the test results entitles Home Depot to an evidentiary presumption that the results were adverse to Wabash's defense. See OCGA § 24-4-22. However, the record reflects that Wabash objected to production of the test results based upon the work-product doctrine, and there is nothing in the record indicating that Home Depot ever moved for the trial court to compel production of the test results or otherwise sought and obtained a ruling on whether the work-product doctrine applied in this circumstance. It is axiomatic that we will not resolve issues that were not raised and ruled upon by the trial court. *Stephens v. Alan V. Mock Constr. Co.*, 302 Ga. App. 280, 287 (2) (690 SE2d 225) (2010). Having failed to file a motion to compel or seek a ruling on the application of the work-product doctrine, Home Depot cannot obtain remedial action in the first instance at the appellate level. See id.

[10] To the extent that Home Depot's promissory estoppel claim was predicated on the same alleged representations forming the basis for its fraud and negligent misrepresentation claims tied to the original manufacture of the trailers, the claim fails for the same reasons discussed supra in Division 3.

[11] See *Mariner Healthcare v. Foster*, 280 Ga. App. 406, 412 (5) (634 SE2d 162) (2006) ("Promissory estoppel does not apply to a promise that is vague, indefinite, or of uncertain duration.").

litigation, and punitive damages. Home Depot could prevail on these claims only if it succeeded on an underlying substantive claim. See *DaimlerChrysler Motors Co. v. Clemente*, 294 Ga. App. 38, 52 (5) (668 SE2d 737) (2008). Because, as explained in the prior divisions of this opinion, Wabash was entitled to summary judgment on all of Home Depot's substantive claims, the trial court did not err in granting summary judgment to Wabash on Home Depot's claims for attorney fees, the expenses of litigation, and punitive damages.

*Judgment affirmed. Adams, J., concurs. McFadden, J., concurs fully and specially.*

MCFADDEN, Judge, concurring fully and specially.

I concur fully in the majority opinion. I write separately to further explain why the evidence put forward by Home Depot is not sufficient to avoid summary judgment.

Home Depot has focused on evidence that the 33 trailers at issue in this case failed inspections. The fact that trailers failed inspections, however, does not show that those trailers suffered from the specific manufacturing defects that Home Depot must prove to prevail on its misrepresentation claims, namely the lack of an anti-corrosive coating and the use of loose scrap metal as a counterweight in the trailers' coupling assemblies. Home Depot's 30 (b) (6) representative testified that Home Depot concluded that these alleged manufacturing defects caused the failed inspections based upon information it received from an engineering firm. Home Depot presented no evidence, however, that the engineering firm actually examined any of the 33 trailers at issue. Moreover, a representative of the engineering firm testified that there could be many different causes for a failed inspection and cautioned that the firm's analysis would not support statistical inferences about the reasons why trailers failed inspections. Instead, he stressed that the trailers should be considered on a "case by case basis."

Home Depot did not put forward any other competent evidence to show that the alleged manufacturing defects caused the failed inspections in the 33 trailers. Notably, the evidence that for a brief period of time, loose scrap metal was used as counterbalancing material in the coupling assemblies of trailers manufactured at the Scott County facility (where the 33 trailers were built), is hearsay; Wabash's 30 (b) (6) representative stated that he had been told this information by another person, whose testimony is not part of the record. Without some evidence connecting the failed inspections of the 33 trailers to the alleged manufacturing defects, the jury would be left merely to speculate as to the cause of those failed inspections. As the majority opinion points out, "[s]ummary judgment cannot be avoided based on speculation or conjecture." (Citation omitted.)

*Cowart v. Widener*, 287 Ga. 622, 633 (3) (c) (697 SE2d 779) (2010).

DECIDED FEBRUARY 27, 2012.

*Parker, Hudson, Rainer & Dobbs, John W. Mitchell, William J. Holley, King & Spalding, Tracy C. Braintwain, Dwight J. Davis*, for appellant.
    *Fried & Bonder, Scott L. Bonder*, for appellee.